## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

_____
)
**UNITED STATES SECURITIES AND**            )
**EXCHANGE COMMISSION,**                      )
)
        **Plaintiff,**            )    **Civil Action No. 21-cv-2114**
)
    **v.**                                        )
)
**CAREBOURN CAPITAL, L.P., AND**            )
**CHIP ALVIN RICE,**                            )
)
        **Defendants,**            )
)
    **and**                                    )
)
**CAREBOURN PARTNERS, LLC,**                )
)
        **Relief Defendant.**        )
_____ )

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") alleges as follows:

## NATURE OF THE ACTION

1.    From at least 2013 through the present, defendants Chip Alvin Rice ("Rice") and Carebourn Capital, L.P. ("Carebourn Capital") (collectively "Defendants") bought and sold billions of newly-issued shares of microcap securities (i.e., penny stocks) – and generated millions of dollars from those sales – but failed to comply with the mandatory dealer registration requirements of the federal securities laws.

2.     Defendants' admitted business model has been at all relevant times to buy convertible promissory notes – a type of security – from penny stock issuers for their own account, convert the notes into newly-issued shares of stock, and quickly sell those shares into the public market at a profit.  From just January 2017 through July 2021, Defendants purchased more than 100 such notes from approximately 40 different penny stock issuers located throughout the United States.

3.     Defendants negotiated and received highly favorable terms for these notes, including terms that gave Defendants deep discounts from the prevailing market price for the shares of counterparty issuers.  Defendants also negotiated and received fees from the issuers for putting the deals together, which Defendants directed be paid to Carebourn Capital's general partner, relief defendant Carebourn Partners, LLC ("Carebourn Partners" or "Relief Defendant").

4.     By engaging in a regular business of buying discounted convertible notes for their own account and then selling the resulting newly-issued shares of penny stock companies' stock into the public market, Defendants operated as unregistered securities dealers.

5.     From just January 2017 through July 2021, Defendants converted and sold over 17.5 billion shares of stock, generated more than $25.8 million in gross stock sale proceeds, and over $13.9 million in net profits, with many deals still outstanding.

6.     In violating the dealer registration requirements of the federal securities laws, Defendants avoided regulatory obligations for dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following

financial responsibility rules, and maintaining books and records in accordance with applicable regulatory requirements.

7.     Through these activities, the Defendants violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)] by acting as unregistered securities dealers. The SEC requests, among other things, that this Court enjoin Defendants from committing further violations of the federal securities laws as alleged in this Complaint, and order them to pay disgorgement and monetary penalties based upon these violations.

## JURISDICTION AND VENUE

8.     The SEC brings this action pursuant to the authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and seeks to restrain and enjoin Defendants from engaging in the acts, practices, transactions and courses of business alleged herein, and for such other equitable relief as may be appropriate for the benefit of investors.

9.     The SEC also seeks a final judgment ordering Defendants and Relief Defendant to disgorge their ill-gotten gains and pay prejudgment interest thereon, and ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and permanently restraining and enjoining Defendants from participating in the offering of any penny stock under Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

10.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. These transactions, acts, practices and courses of business occurred in the District of Minnesota, which is where Carebourn Capital and Carebourn Partners are located and do business, and where Rice resides.

11.    Defendants have, directly and indirectly, made, and are making, use of the mails, and of the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

12.    There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this Complaint, and transactions, acts, practices and courses of business of similar purport and object.

## DEFENDANTS

13.    **Chip Alvin Rice**, age 66, resides in Maple Grove, Minnesota. Prior to starting Carebourn Capital in 2009, he was a licensed broker at Blinder Robinson and RJ Steichen, focusing on high-risk investments in penny stocks.

14.    **Carebourn Capital, L.P.** is a Delaware limited partnership with its principal place of business at Rice's personal residence in Maple Grove, Minnesota. Rice is the managing member of Carebourn Capital and owns a percentage of it through its general partner, Carebourn Partners. Rice solely controls Carebourn Capital.

## RELIEF DEFENDANT

15.    **Carebourn Partners, LLC** is a Minnesota limited liability company with its principal place of business at Rice's personal residence in Maple Grove, Minnesota. Carebourn Partners is the general partner of Carebourn Capital and consists of controlling manager Rice and two other members.  Rice solely controls Carebourn Partners.

## FACTS

16.    During the relevant period, Defendants operated a regular business through which they bought convertible notes – a type of debt security convertible into equity – for Defendants' own account from penny stock issuers in need of cash.  After typically holding the notes for a period contained in an SEC safe harbor that, if satisfied, deems one not to fall within the statutory definition of an underwriter – six months for issuers that are required to file periodic and other certain reports with the SEC, one year for issuers that are not required to do so – Defendants converted the notes into newly-issued shares of stock held by Carebourn Capital at a deep discount to the prevailing market price.  After conversion, Defendants promptly sold that stock into the market, locking in a substantial profit.

### Rice Controlled Carebourn Capital and Its Convertible Debt Business

17.    At all relevant times, Rice possessed and exercised the ultimate decision-making power over Carebourn Capital, including the power to decide whether to enter into each of the convertible deals, to negotiate and approve the final deal terms, and to monitor the status of Carebourn Capital's investments and its sales of stock.

18.    Defendants paid several independent contractors to assist them in locating, negotiating, and managing the entities' transactions.

19.    Rice personally negotiated the terms of the convertible notes that Carebourn Capital purchased from penny stock issuers, as well as amendments to the original terms.  Rice also signed the contracts by which Carebourn Capital acquired the convertible notes.

### Defendants Solicited Financially-Strapped Issuers in Need of Capital

20.    Defendants held themselves out to the public as being willing to buy convertible notes at a regular place of business, which was Rice's personal residence in Maple Grove Minnesota.  For example, Defendants operated a public website, located at www.carebourncapital.com, that advertised to issuers that Defendants operated businesses engaged in private investment in "convertible debentures" through which Defendants would buy the issuers' stock.

21.    Defendants also directly solicited penny stock issuers by cold calling them or meeting with issuer representatives at conferences.  In these direct issuer solicitations, Defendants typically represented to issuer representatives that Defendants sought to invest in the issuer's stock and explained the benefits of a convertible debt transaction.

22.    Because the counterparty issuers in Defendants' convertible note deals often had minimal assets, negative cash flows from operations, and/or unstable operating histories, these companies usually were unable to obtain financing from banks. Therefore, Defendants were able to negotiate highly favorable terms governing the deals with the financially-strapped issuers.

23.    In soliciting issuers for potential convertible note deals, Defendants generally targeted penny stock issuers that had historically large trading volumes – or the potential for large trading volumes – and that were current in their reporting, so that Defendants could easily convert and quickly sell the shares after six months.  Defendants also looked at the amount of other outstanding convertible debt financing, and the amount of authorized but unissued shares.

24.    Defendants targeted these types of issuers with the goal of easily converting and selling into the public market the issuers' shares acquired through the deals.

25.    Defendants sought to engage in convertible note deals with penny stock issuers in trending industries so that there would be sufficient interest by the investing public to buy the shares that Defendants acquired through the deals.  For instance, Defendants entered into convertible note deals with issuers involved with marijuana, cybersecurity, pollution reduction technologies, laser-based monitoring systems, medical devices, and COVID-19-related sanitizers, disinfectants, and personal protective equipment.

### Defendants Purchased Convertible Promissory Notes With Favorable Terms In Order to Obtain Shares of Stock

26.    Defendants obtained nearly all of the stock they sold as part of their business directly from the issuers through note conversions, as opposed to purchases in the secondary market.  The billions of shares that Defendants obtained through their deals with issuers were newly-issued, and their later sales of the shares in the market significantly increased both the amount of shares in the hands of the public and the

issuers' outstanding share totals. Selling into the public market large quantities of newly-issued shares obtained directly from issuers is a common hallmark of a securities dealer.

27.    In addition to profiting from stock sales, the Defendants negotiated with the counterparty issuers an Original Issue Discount or "OID," which entitled Carebourn Capital to repayment or the conversion of stock worth more than the purchase price of the note, at no cost to Carebourn Capital.

28.    For example, on August 29, 2018, Carebourn Capital purchased a convertible promissory note from penny stock issuer Ozop Surgical Corp. ("Ozop"), a medical device and technology company. The principal amount of the note was $339,250, entitling Carebourn Capital to repayment of that full amount plus interest, or the right to convert any unpaid principal and interest into shares of stock at a discounted price. However, the principal amount of the note included an OID of $44,250, resulting in a purchase price to Carebourn Capital of only $295,000 (the difference between $339,250 and $44,250).

29.    Further, the Defendants usually charged counterparty issuers "transactional" or "packaging" fees ("Transactional Fees") for entering into the notes, generally ranging from $5,000 to $75,000 for most deals. Defendants typically directed that the Transactional Fees be included as part of the purchase price of the note and paid to Relief Defendant Carebourn Partners, the general partner of Carebourn Capital and controlled by Rice.

30.    In the above example, Carebourn Capital charged Ozop $15,000 in Transactional Fees. While the Transactional Fees were included in the $295,000

purchase price of the note, the $15,000 in fees were disbursed directly from Carebourn Capital to Carebourn Partners as Carebourn Capital's "designee." As a result of the OID and Transactional Fees, Carebourn Capital only sent $280,000 in cash to Ozop, but was entitled to repayment – or the right to convert into stock – of the full principal amount of $339,250, plus interest.

31.     From at least January 1, 2017 through March 31, 2021, Carebourn Partners received at least $1.1 million in Transactional Fees that Carebourn Capital charged the penny stock issuers. Carebourn Partners' receipt of these fees arose solely from the illegal unregistered dealer activity of Defendants as set forth in this Complaint, and Carebourn Partners has no legitimate claim to this unjust enrichment.

## Defendants Converted the Promissory Note
## Debt Into Stock at a Substantial Discount

32.     SEC Rule 144, a safe harbor from the statutory definition of an underwriter, was adopted to establish criteria for determining whether a person was engaged in a distribution of securities. Under Rule 144, non-affiliates who acquire restricted stock directly or indirectly from the issuer in a private transaction may be able to resell it free of restriction into the market after observing a holding period. [See 17 C.F.R. § 210.144]

33.     Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144. For that reason, Defendants generally waited either six months (the minimum Rule 144 holding period for securities issued by SEC-reporting companies) or one year (the minimum Rule 144 holding period for securities issued by

non-SEC-reporting companies) after purchasing a convertible note before they began to convert the note to newly-issued stock and then sell that stock into the public market.

34.    The convertible notes that Defendants bought from the issuers allowed Defendants to receive billions of shares of issuer stock at a substantial discount – typically between 35 to 50 percent below the prevailing market price of the stock preceding the conversion request.  In the Ozop example discussed above, Carebourn was entitled to a 45 percent discount from the prevailing market price, defined as the lowest trading price for the stock during the 25 trading days prior to conversion.

35.    Certain convertible note deals permitted additional discounts if Defendants encountered difficulty depositing the stock with brokerages, or if the issuer defaulted on the note.  Many of the notes also had rather draconian prepayment provisions that discouraged the issuer from paying off the notes ahead of schedule, which allowed Defendants time to convert the maximum amount of debt into stock.

36.    After holding the convertible debt acquired in a convertible note deal for the applicable holding period contained in Rule 144, Defendants sent a conversion notice to the issuer and its transfer agent identifying the amount to be converted and the corresponding shares to be received by Defendants.

37.    Instead of converting all of the debt into stock all at once, Defendants usually sent multiple conversion notices for each convertible note.  Among other reasons, Defendants converted debt over a period of time to avoid owning more than 5 percent of any class of an issuer's publicly traded stock, which would have required Defendants to file a "beneficial ownership report" (SEC Schedule 13D) with the SEC.

10

38.     Defendants arranged for the converted stock to be transferred to Carebourn Capital's numerous brokerage accounts as quickly as possible, including often paying rush fees to expedite this process.  As part of this process, Defendants obtained attorney opinion letters to assure brokerage firms that the converted stock was not restricted and could be resold to the public.

### Defendants Sold the Converted Stock Into the Public Market

39.     Once brokers deposited the converted shares from the issuers into the Carebourn Capital's brokerage accounts, Defendants usually began selling the shares into the public market immediately to lock in their profits.

40.     Rice personally, or through an independent contractor acting at his direction, used the telephone and the Internet to place sell orders.  Sales were made through brokers and OTC Link ATS, operated by OTC Markets Group, Inc. ("OTC Link"), an SEC-registered alternative trading system that displays quotes from broker-dealers for securities of companies not registered with the SEC and not listed on stock exchanges.

41.     However, Defendants generally only sold as much as the market would bear, often staggering their sales over a period of time instead of all at once.

42.     Defendants' practice was to sell the shares they had acquired in a conversion continuously on a daily or near-daily basis until they had sold all of their shares into the market.  Defendants mostly completed this process in a month or less.

## Defendants' Earned Significant Profits From Selling Discounted Shares of Stock

43.    Defendants reaped large profits from their unregistered dealer activity, the majority of which resulted from the difference between the market prices they received when they sold the stock to the public, and the deeply discounted prices at which they acquired shares from the issuers, rather than from any appreciation in the stock's price. This mechanism, which gave Defendants a spread or markup on the stock that they sold, is a common attribute of a securities dealer.

44.    From January 2017 through July 2021, Defendants purchased more than 100 convertible promissory notes from approximately 40 different penny stock issuers, and sold into the public market more than 17.5 billion newly-issued shares of stock from those notes for Defendants' own account.

45.    During this same timeframe, Defendants generated more than $25.8 million in gross stock sale proceeds and over $13.9 million in net profits, with many deals still outstanding.  The majority of the net profits came from the spread between Defendants' discounted acquisition cost for the stock and the prevailing market price.

46.    The following are examples of transactions during the relevant period in which Defendants acquired convertible notes from specific penny stock issuers, exercised their conversion rights, and sold the resulting newly-issued stock into the market for a significant profit:

A.    Defendants acquired convertible notes from Optec International, Inc., a company involved in pollution reduction technologies, in which they invested

more than $1.9 million, received more than 197,910,000 shares, and sold most of those shares into the market for net profits of more than $10.6 million;

        B.    Defendants acquired convertible notes from Bravatek Solutions, Inc. ("Bravatek"), a company involved in, among other things, cyber security and COVID-19-related products, in which they invested more than $1.9 million, received more than 2,775,715,000 shares, and sold those shares into the market for net profits of over $2.8 million; and

        C.    Defendants acquired convertible notes from Innerscope Hearing Technology, a company that provided hearing aids and wearable personal sound amplifier products, in which they invested more than $605,000, received more than 33,885,000 shares, and sold those shares into the market for net profits of more than $999,000.

      47.    Defendants used the proceeds from the sales of the shares to fund their regular business of purchasing additional convertible promissory notes.

### Impact of Defendants' Trading of Penny Stock in the Public Market

      48.    Defendants were one of the larger and more active traders in the market for many issuers' stock.  For example, during 2020, Defendants actively traded stock of the following four issuers, among others: Bravatek (BVTK), Ozop (OZSC), Grow Solutions Holdings, Inc. (GRSO), and FONU2, Inc. (FONU).  As the table below shows, Carebourn Capital's approximate average daily volume percentage in these four stocks exceeded 5%, and on some days its volume in those stocks was far higher:

13

| Carebourn Capital's 2020 Trading Volume Analysis | | | | | |
|---|---|---|---|---|---|
| Issuer | No. of Trade Dates | Average % of Total Volume | Highest Daily % | Lowest Daily % | Total Shares Sold by Carebourn | Total Volume of Shares Sold |
| BVTK | 34 | 31.38% | 78.52% | 4.40% | 18,812,302 | 88,373,589 |
| GRSO | 47 | 9.26% | 32.14% | 0.67% | 121,928,270 | 3,122,918,083 |
| OZSC | 49 | 5.09% | 18.73% | 0.25% | 101,835,272 | 3,620,234,236 |
| FONU | 16 | 11.18% | 59.40% | 0.30% | 38,888,889 | 803,877,385 |

**Defendants Continue to Convert and Sell Shares of Stock**

49.    Defendants continue to purchase new convertible notes, convert shares acquired in convertible debt transactions with counterparty penny stock issuers, and then sell those shares into the market.  In just the first six and-a-half months of 2021 (through July 21, 2021), Defendants sold over 644,000,000 shares of converted stock into the market for gross proceeds of over $6 million.

**Defendants Violated The Federal Securities
Laws By Acting As Unregistered Dealers**

50.    Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer.  [15 U.S.C. § 78o(a)(1)].

51.    Defendants used means or instrumentalities of interstate commerce to buy and sell securities for their own account as part of their regular business.  For example, Defendants used the Internet to solicit penny stock issuers, transferred cash through wire

14

transfers, and used email and telephone communications to negotiate and effectuate sales transactions through their brokers and OTC Link.

52.     Defendants engaged in much of the conduct described in this Complaint at their Maple Grove, Minnesota address in this District.

53.     While Defendants engaged in this conduct, they were not registered with the SEC as dealers or associated with dealers registered with the SEC.

54.     A person who acts as a dealer must file an application on a form called Form BD.  Form BD asks questions about the applicant and its principals, controlling persons, and employees.  An applicant must file the Form BD with the Central Registration Depository, which is operated by the Financial Industry Regulatory Authority, Inc. ("FINRA").  The dealer registration requirements provide important safeguards for the investing public.

55.     For example, registration with the SEC requires the dealer to disclose important information about its business, including but not limited to (a) the names of the direct and indirect owners and executive officers of the business; (b) certain arrangements with other persons or entities; (c) the identities of those who control the business; (d) the states in which the dealer does business; (e) past criminal or regulatory actions against the dealer or any affiliated person that controls the business; and (f) financial information, including bankruptcy history.  Further, registration requires the dealer to join a self-regulatory organization, such as FINRA, or a national security exchange, which assist the SEC in regulating the activities of registered dealers.  Finally, registered dealers are

subject to inspection by the SEC and FINRA to ensure that they comply with the securities laws.

## Defendants Sold Penny Stock

56.     Defendants sold stock that did not meet any of the exceptions from the definition of a "penny stock," as defined by Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51-1.   [See 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1].

57.     Defendants therefore participated in the offering of penny stock by acting as securities dealers engaged in the selling of penny stocks.

## COUNT I

### Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)] (Against Defendants)

58.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 57 above.

59.     By engaging in the conduct described above, Defendants made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, and to attempt to induce, the purchase and sale of, securities as part of a regular business while not registered with the SEC as dealers, and when Defendants were not associated with an entity registered with the SEC as a dealer.

60.     By reason of the foregoing, Defendants violated, and unless enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## COUNT II

### (Against Relief Defendant)

61.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 57 above.

62.     Defendants charged penny stock issuers Transactional Fees that were paid to Relief Defendant Carebourn Partners.  The Transactional Fees charged to the penny stock issuers were disbursed directly to Relief Defendant and included as part of the principal of the convertible promissory notes with the issuers.

63.     The payment of fees to Relief Defendant arose solely from the illegal unregistered dealer activity of Defendants as set forth in this Complaint, and as such constitute the receipt of ill-gotten gains and/or unjust enrichment.

64.     Relief Defendant has no legitimate claim to the ill-gotten funds it received and charged to the issuers.

## RELIEF REQUESTED

### I.

### (Injunctive Relief Against Future Securities Law Violations)

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of

similar purport and object, in violation of Section 15(a)(1) of the Exchange Act [15
U.S.C. § 78o(a)(1)].

## II.

## (Disgorgement as to Defendants)

Issue an Order requiring Defendants to disgorge, jointly and severally, all ill-
gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment
interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections
21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

## III.

## (Disgorgement as to Relief Defendant)

Issue an Order requiring Relief Defendant to disgorge all ill-gotten gains and/or
unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a
result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7)
[15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

## IV.

## (Civil Penalties)

Issue an Order imposing appropriate civil penalties upon Defendants pursuant to
Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

## (Penny Stock Bar)

Issue an Order permanently restraining and enjoining Defendants from
participating in the offering of any penny stock, including engaging in activities with a

broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

## VI.

### (Retention of Equitable Jurisdiction)

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

### (Other Relief)

Grant such orders for further relief the Court deems appropriate.

//

//

//

//

//

//

//

//

## JURY DEMAND

The SEC demands a jury trial pursuant to Federal Rule of Civil Procedure 38.


Dated: September 24, 2021                          Respectfully submitted,

                                                   **UNITED STATES SECURITIES
                                                   AND EXCHANGE COMMISSION**

                                                   <u>/s/ Timothy J. Stockwell</u>
                                                   Timothy J. Stockwell
                                                   D.C. Bar No. 484238
                                                   Christopher H. White
                                                   IL Bar No. 6280031
                                                   Charles J. Kerstetter
                                                   PA Bar No. 67088
                                                   *Attorneys for Plaintiff U.S. Securities
                                                   and Exchange Commission*

                                                   175 West Jackson Boulevard, Suite 1450
                                                   Chicago, Illinois 60604
                                                   Telephone: (312) 596-6049
                                                   Email: stockwellt@sec.gov

                                                   Craig Baune
                                                   MN Bar No. 331272)
                                                   Assistant United States Attorney
                                                   District of Minnesota
                                                   600 U.S. Courthouse
                                                   300 South Fourth Street
                                                   Minneapolis, MN  55414
                                                   Telephone: (612) 664-5600
                                                   Email: craig.baune@usdoj.gov

                                                   *Local Counsel*