UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States Securities and Exchange Commission, | No. 21-cv-2114 (KMM/JFD) |
| Plaintiff, | **ORDER** |
| v. | |
| Carebourn Capital, L.P. et al., | |
| Defendants. | |

This matter is before the Court on the Defendants'[1] Motion for Judgement on the Pleadings. [ECF No. 51]. In its Complaint, the U.S. Securities and Exchange Commission ("SEC") alleges that Defendants "bought and sold billions of newly-issued shares of microcap securities . . . but failed to comply with the mandatory dealer registration requirements of the federal securities laws." [ECF No. 1 ¶ 1]. Defendants argue that the Complaint must be dismissed because it fails to state a claim and that the statutory definition of "dealer" in the federal securities laws is so vague that the SEC's enforcement of its provisions against them violates the Due Process Clause. [ECF No. 52]. For the reasons explained below, Defendants' motion is denied.

---

[1] The Court refers to Carebourn Capital, L.P.; Carebourn Partners, LLC; and Chip Alvin Rice collectively as "Defendants."

I.   **BACKGROUND**[2]

Federal law provides that a person engaged in a regular business of buying and selling securities for his own account, whether through a broker or otherwise, must register as a dealer with the SEC. 15 U.S.C. § 78o(a)(1) (requiring registration of brokers and dealers); *id.* § 78c(a)(5)(A) (defining the term "dealer"). The SEC alleges that Defendants operate a regular business of buying and selling securities by purchasing convertible promissory notes from penny-stock issuers, converting the notes into newly-issued shares of stock, and quickly selling those shares into the public market at a profit. The SEC's Complaint identifies several characteristics of Defendants' transactions with penny-stock issuers that allegedly support its claim that Defendants are required to register.

For example, the SEC claims that Defendants operated a public website (www.carebourncapital.com) that advertised to penny-stock issuers that Defendants made private investments in "convertible debentures" through which Defendants would buy the issuers' stock. Defendants also solicited small businesses to enter these kinds of deals, placing calls directly to penny-stock issuers and meeting with the issuers' representatives at conferences.

Defendants allegedly sought out businesses with specific features for their convertible debt arrangements. The stock issuers with which Defendants did business often had minimal

---

[2] Because a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) applies the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6), the factual background for this Order is drawn from the SEC's Complaint. *See, e.g., Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (discussing standard for a motion under Fed. R. Civ. P. 12(c)).

assets, negative cash flow, or unstable operating histories. Consequently, the businesses were unable to obtain bank loans, and Defendants could obtain favorable terms for the purchase of convertible debt notes from them. Defendants also sought out stock issuers with large trading volumes so that any newly issued stock obtained through the convertible debt notes could be converted to stock and quickly sold back into the public market. In addition, Defendants targeted penny-stock issuers in trending industries where the investing public demonstrated interest in purchasing shares. These included issuers involved with cannabis; cybersecurity; pollution reduction technologies; laser-based monitoring systems; medical devices; and COVID-19-related sanitizers, disinfectants, and personal protective equipment.

The favorable terms obtained by Defendants included an Original Issue Discount or "OID." The OID allowed Defendants to receive repayment or conversion of stock worth more than the purchase price of the promissory note if the business was unable to repay the loan in full. In one example, Defendants purchased a note from a medical device company in August 2018 for $44,000 less than the purchase price of the note. Defendants would also charge penny-stock issuers transaction fees of between $5,000 and $75,000 for most of the deals they made. In the same August 2018 deal with the medical device company, Defendants charged a $15,000 fee to the issuer. This fee further decreased the amount of cash Defendants paid to the issuer for the note. Between January 2017 and March 2021, the SEC alleges that Defendants obtained at least $1.1 million in transactional fees alone.

Defendants' convertible notes also allowed them to receive billions of shares of issuer stock at a significant discount. Defendants typically obtained shares at 35% to 50% below the prevailing market price. For example, in the August 2018 deal with the medical device

3

company, Defendants obtained newly issued stock at a 45% discount from the prevailing market price. The convertible note deals allowed Defendants to receive additional discounts if they had trouble depositing the converted stock with a brokerage or if the issuer defaulted on the note. Further, the notes included prepayment provisions that discouraged issuers from paying off the notes early, allowing Defendants time to convert the largest amount of debt into stock.

Defendants also held onto the securities they obtained for only the minimum amount of time required before sending the issuers conversion notices. For example, SEC Rule 144 establishes a six-month holding period for securities issued by SEC-reporting companies and a one-year holding period for securities issued by companies that do not report to the SEC. Once Defendants held the convertible debt for either six months or one year, depending on the type of business from which they purchased the notes, Defendants would send the issuers conversion notices indicating how much of the debt would be converted and how many shares Defendants would receive. Defendants allegedly sent issuers multiple conversion requests in succession to avoid owning more than 5% of any issuer's publicly traded stock at a single time. By doing so, Defendants avoided SEC beneficial-ownership reporting requirements.

The SEC alleges that after Defendants received stock from an issuer, they arranged for shares to be sent to several brokerage accounts so that the shares could be resold to the public as quickly as possible. Defendants obtained attorney opinion letters to assure the brokerage firms that the converted stocks were eligible for public resale. Defendants sold as much of the stock at one time as the market would bear and staggered sales to occur

continuously on a daily or near-daily basis until all of their shares were sold into the market. The process typically took a month or less to complete.

Defendants engaged in a high volume of these convertible debt transactions between January 2017 through July 2021. They purchased more than 100 convertible promissory notes from around 40 different penny-stock issuers and sold more than 17.5 billion newly-issued shares of stock from those notes into the public market. According to the SEC, Defendants' trades over a relatively short period of time represented an uncharacteristically high percentage of the total trading volume for several companies from which Defendants acquired stock.

Between January 2017 and July 2021, Defendants generated over $13.9 million in net profits from these convertible debt transactions. A significant portion of their profits were obtained from the difference between the market prices at which the shares were sold to the public and the discounted prices at which the shares were acquired from the issuers. The SEC asserts that obtaining profits based on a price markup rather than appreciation of the stock's price is a common attribute of a securities dealer.

The SEC alleges that these characteristics of Defendants' convertible note transactions amounted to a regular business of buying and selling securities for Defendants' own account, requiring Defendants to register as a dealer with the SEC. However, Defendants never registered with the SEC, nor did they associate with a registered dealer. Defendants never filed an application using SEC Form BD, which requires disclosures about the applicant and the applicant's principals, controlling persons, and employees. Defendants

did not join a self-regulatory organization, such as the Financial Industry Regulatory Authority, Inc.

Because the SEC claims that Defendants' failure to register violates § 15(a)(1) of the Exchange Act, the SEC seeks a permanent injunction prohibiting Defendants from engaging in similar convertible note transactions in the future. The SEC also seeks an order requiring Defendants to disgorge their "ill-gotten gains" along with prejudgment interest, imposing appropriate civil penalties, and barring them from further participating in the offering of any penny-stock.

## II.   LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure allows a party to move for judgment on the pleadings at any time after the pleadings have closed, so long as the motion is made early enough to avoid a delay in trial. Such a motion is evaluated under the same standard as a motion for failure to state a claim under Rule 12(b)(6). *Ashley Cnty.*, 552 F.3d at 665. A court deciding a Rule 12(c) motion accepts the facts alleged in the complaint as true and draws all reasonable inferences in favor of the nonmoving party. *Partridge v. City of Benton*, 929 F.3d 562, 564 (8th Cir. 2019). "Judgment on the pleadings 'should be granted only if the moving party has clearly demonstrated that no material issue of fact remains and the moving party is entitled to judgment as a matter of law.'" *Id.* at 564–65 (quoting *Whatley v. Canadian Pac. Ry. Ltd.*, 904 F.3d 614, 617–18 (8th Cir. 2018)).

Courts generally do not consider matters outside the pleadings when ruling on a motion for judgment on the pleadings. If a court does consider such material, it must convert the motion to a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d).

6

However, courts may consider exhibits attached to the pleadings. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). A court may also consider matters of public record and materials that are necessarily embraced by the pleadings when considering a motion for judgment on the pleadings. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

### III. DISCUSSION

Defendants assert that they are entitled to judgment on the pleadings because the Complaint has not sufficiently alleged that they engaged in conduct requiring them to register with the SEC under the Exchange Act's dealer provision. Defendants also contend that the statutory definition of "dealer" is so vague that the statute fails to provide sufficient notice of the conduct that requires registration. As a result, they argue that granting the relief the SEC seeks would violate the Defendants' due process rights. Finally, Defendants argue that the SEC has failed to allege facts that would entitle them to a disgorgement remedy.

#### A. Materials Attached to Defendants' Motion

Along with their motion, Defendants filed an affidavit of defense counsel, Kyle Hahn. Attached to Mr. Hahn's affidavit are: (1) a copy of a convertible promissory note with DarkPulse, a penny-stock issuer; (2) a legal opinion issued to Carebourn Capital, L.P., in connection with a request for a conversion of debt to shares of stock; (3) an agreement between Carebourn Capital, L.P., and a brokerage for another penny-stock issuer; (4) a copy of a transcript from a hearing before the 73rd Congress in 1934; and (5) complaints filed in several SEC enforcement actions against others who engaged in similar convertible debt transactions. [ECF No. 53]. The SEC argues that the Court must ignore some of these

materials because they are matters outside the pleadings. Specifically, the SEC argues that unless the motion is converted to one for summary judgment, the Court should not consider the DarkPulse promissory note, the legal opinion, or the brokerage agreement.[3] The SEC asserts that the DarkPulse note is not specifically mentioned in the Complaint and the legal opinion and brokerage agreement respectively concern "a completely unrelated conversation request" and "yet another unrelated issuer." [ECF No. 57 at 12–14].

Ultimately, the Court finds it is unnecessary to decide whether any of the challenged exhibits must be excluded in considering the Defendants' motion for judgment on the pleadings. Even if the DarkPulse note, the legal opinion, and the brokerage agreement are considered, the Court concludes that the SEC has adequately state a claim for relief.

B. **Dealer Definition**

The SEC claims that Carebourn bought and sold securities in violation of the statute requiring "dealers" to register with the SEC. The Securities Exchange Act of 1934 requires both brokers and dealers to register with the SEC. 15 U.S.C. § 78o(a)(1). The statute provides a definition of the term "dealer." It "means any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." *Id.* § 78c(a)(5)(A). However, "a person that buys or sells securities . . . for such

---

[3] The SEC does not suggest that the transcript of the congressional hearing or the other SEC complaints cannot be considered by the Court without converting the Defendants' Rule 12(c) motion to one for summary judgment. Indeed, the Court finds these exhibits to the Hahn Affidavit are matters of public record of which the Court may take judicial notice in resolving the pending motion under the Rule 12(c) standard.

person's own account . . . but not as a part of a regular business" is not a dealer. *Id.* § 78c(a)(5)(B).

The allegations in the Complaint state a plausible claim that Defendants were engaged in the business of buying and selling securities for their own account through a broker or otherwise. Taken as true, those allegations indicate that Defendants operated a website through which they solicited penny-stock issuers to engage in convertible debt transactions and that they would solicit the issuers at conferences. The Defendants sought and obtained favorable terms from businesses that could not obtain financing from banks. These terms included discounted prices upon the conversion of the note to shares of stock, substantial transaction fees, and prepayment penalties that would discourage payoff prior to the point when the debt could be converted into shares. The Defendants did not hold onto the stock they acquired in an effort to realize gains on any appreciation in share price. Instead, they sold the stock as soon as they were able so they could profit off the difference between the discounted share price they received when they converted the promissory note to stock and the market price they could receive when their brokers made the stock available to the investing public. Defendants engaged in over one hundred such transactions from at least forty separate penny-stock issuers involving billions of converted shares. They did so over a relatively short period of time and earned a significant profit of nearly $14 million.

These facts, taken as true, could allow a conclusion that registration was required of the Defendants. "The centerpiece to the dealer definition is the word business, which is defined as a commercial enterprise carried on for profit, a particular occupation or employment habitually engaged in for livelihood or gain." *Sec. & Exch. Comm'n v. Keener*

9

("*Keener II*"), No. 20-cv-21254-BLOOM/Louis, 2022 WL 196283, at *7 (S.D. Fla. Jan. 21, 2022) (cleaned up).[4] A high volume of buying and selling securities can be indicative of engaging in a regular business such that registration is required. *See Sec. & Exch. Comm'n v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (concluding that the defendant was a dealer where he engaged in a "high level of activity" that "made him more than an active investor"); *Keener II*, 2022 WL 196283, at *11 ("Here the Court agrees with Plaintiff that the volume of Defendant's trading activity and business operations support the finding that Defendant was 'engaged in the business' of buying and selling securities within the meaning of the term 'dealer' under the Exchange Act."); *Sec. & Exch. Comm'n v. Almagarby*, 479 F. Supp. 3d 1266, 1272 (S.D. Fla. 2020) ("[T]he sheer volume of the number of deals and the large sums of profit Defendants generated . . . give[] credence to the proposition that Defendants were engaged in the 'business' of buying and selling securities."). "Regularity of participation" illustrated through the "dollar amount of securities sold . . . and the extent to which advertisement and investor solicitation were used" can also show that one was engaged in the business of buying and selling securities. *Sec. & Exch. Comm'n v. Ofill*, No. 3:07-cv-1643-D, 2012 WL 246061, at *7 (N.D. Tex. Jan. 26, 2012) (citing *Sec. & Exch. Comm'n v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1, 12–13 (D.D.C. 1998)). In light of the allegations in the

---

[4] The *Keener II* court relied on the Eleventh Circuit's interpretation of the dealer definition in the Securities Act of 1933 in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015), and noted that the *Big Apple* court had found that definition to be "very similar" to the dealer definition in the Exchange Act of 1934. *Keene II*, 2022 WL 196283, at *8 n.3 (citing *Big Apple*, 783 F.3d at 809 n.11). Given the recognition of the similarity between the definitions in the two statutes, this Court finds the Defendants' efforts to distinguish *Big Apple* on this basis unavailing.

10

Complaint, the statutory language, and the caselaw interpreting the Exchange Act's dealer definition, the Court concludes that the SEC has stated a claim for relief.

Defendants raise several unpersuasive arguments in support of their position that the SEC's Complaint insufficiently states a claim regarding the dealer-registration requirement. For example, Defendants argue that the SEC fails to allege that they sold shares in the public market because the Complaint indicates that their sales were made through brokers, not directly to the buying public. [ECF No. 52 at 9 (citing ECF No. 1 ¶ 39)]. This argument ignores the statutory definition of "dealer." Specifically, the statute indicates that a dealer includes one who buys and sells securities "through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A).

Defendants also suggest that the SEC fails to state a claim because their activities were not part of a regular business. Defendants argue that Mr. Rice operated Carebourn Capital, L.P., merely as an active trader or investor. They claim that he was not engaged in a regular business because he engaged in arms-length negotiations with penny-stock issuers, the convertible debt transactions were approved by attorneys, and Defendants used the services of a broker-dealer when the acquired shares were sold. Further, Defendants argue that they never held themselves out as willing to buy and sell a particular security, did not provide investment advice to customers, handled no client money or client securities, and paid a commission to their own broker/dealer every time they liquidated shares in their accounts. In essence, Defendants argue these realities place them within the exception for those who buy or sell securities for their own accounts "but not as part of a regular

business," within the meaning of 15 U.S.C. § 78c(a)(5)(B).[5] This argument does not provide any basis for the Court to conclude that Defendants are entitled to judgment on the pleadings. It does not focus at all on the allegations in the SEC's Complaint. When the Court's attention is where it should be—on the allegations in the Complaint—it is apparent that the SEC has adequately stated a claim for relief.

Defendants' position also reflects a misplaced reliance on a multi-factored inquiry discussed in the SEC's Guide to Broker-Dealer Registration ("the Guide"). *See Guide to Broker-Dealer Registration*, U.S. Securities and Exchange Commission, Division of Trading and Markets, April 2008, https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html (last visited May 24, 2022). Defendants suggest that the SEC has indicated that nine factors identified in the Guide need to be established before registration as a dealer is required. Like other courts faced with this argument, however, this Court concludes that the Guide invites a fact-intensive analysis that is ill-suited for application to a motion like this one. *E.g.*, *Sec. & Exch. Comm'n v. Keener* ("*Keener I*"), No. 1:20-cv-21254 (BLOOM/Louis), 2020 WL 4736205, at *4 (S.D. Fla. Aug. 14, 2020) (rejecting the defendant's argument at the motion to dismiss stage that he was not required to register as a dealer under the Exchange Act based on the factors discussed in the

---

[5] *See* ECF No. 52 at 2–5 (setting forth the Defendants' preferred narrative). The Defendants have also unpersuasively challenged the SEC's allegations on grounds that the SEC does not offer "proof" in support of its claims. For example, Defendants contend that the SEC fails to prove that they solicited issuers because the SEC has offered no evidence that any issuer referenced in the Complaint actually saw Defendants' website. ECF No. 52 at 19. However, the Court is required to accept the SEC's factual allegations as true when ruling on a motion for judgment on the pleadings: now is not the time the weigh the proof on either side.

Guide); *Sec. & Exch. Comm'n v. River N. Equity, LLC*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019) (same).

Defendants further suggest that the SEC's dealer-registration claim fails because the Complaint does not allege that Defendants engaged in securities transactions on behalf of or for others (i.e., for clients or customers).[6] However, the statutory definition of "dealer" expressly includes those who buy and sell securities for their own accounts. Defendants conflate this definition with that applicable to "brokers." The statute defines a "broker" as "any person engaged in the business of effecting transactions in securities *for the account of others*." 15 U.S.C. § 78c(a)(4)(A) (emphasis added). Because it contains no such requirement, the plain language of the statutory definition for a "dealer" undermines this argument.

Defendants' reliance on testimony during congressional hearings on the bills that would become the Exchange Act is similarly unpersuasive.[7] The discussion cited by Defendants reveals that legislators believed that an individual who invested his or her own money for their own account should not be required to register with the SEC. The cited language clarifies that there is a distinction between one who does such personal investing and those who are engaged in a regular business. It does not, as Defendants suggest, support an interpretation of the statute that for one to be a "dealer," he or she must be engaged in providing "dealer services" to customers.

Defendants next argue that the phrase "buying and selling securities" is not defined in the statute, and as a result, the text must be interpreted as it was understood at the time

---

[6] *See* ECF No. 52 at 13–22.

[7] *See* ECF No. 52 at 15–17.

Congress passed the Exchange Act. Defendants creatively point to cases decided in the years before the passage of the original federal statute where state courts reviewed their own states' laws applicable to "dealers" of certain goods. In the decisions cited by Defendants, the courts concluded that the businesses were not dealers within the meaning of the various statutes because they did not buy and sell the same articles in the same condition.[8] Because Defendants loaned money to penny-stock issuers and then converted the promissory notes into newly issued stock which was resold through a broker, Defendants contend that they cannot qualify as a "dealer." They argue that the SEC has failed to allege that they bought and sold the same securities in the same condition.[9] The Defendants' reliance on these state cases is misplaced. None of the cases involved an interpretation or application of the "dealer" definition from the Exchange Act and they provide no insight into congressional intent in defining what it means for a person to be in the business of buying and selling securities under the relevant statutory language.

In sum, the Court concludes that the SEC has adequately stated a claim that Defendants were required to register as a "dealer" under the federal securities laws, but failed to do so.

---

[8] *State v. Yearby*, 82 N.C. 561, 562 (N.C. 1880) (examining a licensing statute and concluding that a butcher is not a dealer because a butcher does not buy and sell the same article in the same condition); *Kansas City v. Butt*, 80 Mo. App. 237, 239–40 (Mo. Ct. App. 1901) (interpreting a licensing law applicable to "ice dealers" to exclude manufacturers who transform raw materials); *State v. San Patricio Canning Co.*, 17 S.W.2d 160, 162–63 (Tx. Ct. Civ. App. 1929) (holding that a shrimp canner was not a dealer within the meaning of a licensing and tax statute because the raw material, shrimp, was not resold in the same state in which it was purchased).

[9] ECF No. 52 at 9–12.

### C.     Due Process

Defendants next argue that the SEC's failure-to-register claim should be dismissed because the statute does not provide adequate notice that Defendants' unregistered conduct could be unlawful. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A punishment, such as a civil penalty, may violate the Due Process Clause if the relevant statute or regulation "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (quotation omitted). "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *Id.* For civil statutes that "'regulate economic activities[,] a party lacks fair notice when the relevant standard is so vague as to be no rule or standard at all.'" *Sec. & Exch. Comm'n v. Fierro*, No. 20-cv-2104 (MAS)(DEA), 2020 WL 7481773, at *5 (D.N.J. Dec. 18, 2020) (quoting *Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236, 249 (3d Cir. 2015)).

Here, it cannot be said that the statute is so vague as to be no standard or rule at all. As discussed, the Exchange Act requires a dealer to register with the SEC and defines who is a dealer. That definition—"any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise,"—sets a reasonably clear standard by which a person can determine whether or not his conduct is lawful. 15 U.S.C. § 78c(a)(5)(A).

Other courts have rejected identical arguments based on the plain language of the Exchange Act's "dealer" definition. *See Sec. & Exch. Comm'n v. Fife*, No. 20-cv-5227, 2021 WL 5998525, at*7 (N.D. Ill. Dec. 20, 2021) (rejecting due process argument on motion to dismiss because the statutory language plainly provided notice to the defendants "and all others even arguably involved in securities transactions"); *Keener I*, 2020 WL 4736205, at *5 (finding that dismissal for a due process violation was improper where the allegations suggested the defendant was not a novice investor, that the express language of the Exchange Act contradicted his claim that he had no way of knowing what conduct would be unlawful, and that the SEC's own guidance indicates when a party can be deemed a dealer); *River North*, 415 F. Supp. 3d at 859 ("[Defendants] argue that allowing the claims against them to go forward would violate their due process rights . . . . But while the Court agrees that formal SEC guidance on these matters would be helpful, it cannot conclude that the SEC's claims fail as a matter of law for lack of it. The definition at issue is broad. The factors for the Court's consideration are merely factors. And the players in this case are not new to this field.").

Like these other courts, this Court concludes that the Exchange Act's "dealer" definition is not so vague that enforcement of the dealer-registration requirement against Defendants would violate the Due Process Clause.

**D.    Disgorgement**

Finally, Defendants argue that the Court should dismiss the SEC's request for a disgorgement remedy. The Court rejects the Defendants' request for dismissal of this portion of the SEC's prayer for relief.

16

> [I]t would be premature at the pleadings stage to determine whether the specific forms of disgorgement sought by the SEC are prohibited as a matter of law, and . . . instead any determination on the availability of specific forms of relief should be undertaken after the case has been factually and legally developed.

*Fife*, 2021 WL 5998525, at*8.

## IV. ORDER

For the reasons stated above, the Defendants' Motion for Judgment on the Pleadings [ECF No. 52] is **DENIED**.

Date: May 24, 2022

                                                        *s/Katherine Menendez*
                                                        Katherine Menendez
                                                        United States District Judge