## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States Securities and Exchange Commission, | No. 21-cv-2114 (KMM/JFD) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Carebourn Capital, L.P.; Carebourn Partners, LLC, *Relief Defendant*; and Chip Alvin Rice; | |
| Defendants. | |

The Securities and Exchange Commission ("SEC") brought this action against Defendants Carebourn Capital, L.P., Carebourn Partners, LLC, and Chip Alvin Rice, alleging that they bought and sold billions of newly issued shares of microcap securities, but did so without registering as or associating with a "dealer" as required by the federal securities laws. Among other arguments, Defendants suggest that the registration requirement does not apply to them because they did not engage in conduct that makes them "dealers" under the relevant statutes and applicable regulations. The parties have filed cross-motions for summary judgment [Dkt. 125, 132.] Because the Court concludes that there is no genuine dispute that Defendants acted as dealers in violation of the statutory registration requirement, the SEC's motion for summary judgment is granted, and the Defendant's motion is denied.

# BACKGROUND

### *Dealer Registration*

The Securities Exchange Act of 1934 (the "Exchange Act") requires both brokers and dealers to register with the SEC. 15 U.S.C. § 78o(a)(1). Specifically, § 78o(a)(1) provides

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer other than a natural person ... to make use of the mails or any means or instrumentality of interstate commerce[1] to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security ... unless such broker or dealer is registered in accordance with subsection (b) of this section.

*Id.*

The statute defines the term "dealer" as "any person engaged in the business of buying and selling securities ... for such person's own account through a broker or otherwise." *Id.* § 78c(a)(5)(A). However, "a person that buys or sells securities ... for such person's own account ... but not as a part of a regular business" is not a dealer. *Id.* § 78c(a)(5)(B).

The Exchange Act does not explain what it means for a person to be "engaged in the business of buying and selling securities," nor "as part of a regular business," and this case is about whether the Defendants did just that.

---

[1] There is no genuine dispute that Defendants' conduct in this case involved the use of interstate telephone calls, email communications, and travel.

***The Defendants***

Chip Rice is a Minnesota resident who has been in the securities business since 1987 and has many connections in the industry. [Stockwell Aff., Ex. 1, Defs.' Suppl. Interrog. Resps. ("Def. Suppl. ROGs") at 3, Dkt. 128-1.] Before he became involved with Carebourn Capital L.P. (hereafter "Carebourn"), he was a licensed broker at Blinder Robinson and RJ Steichen, focusing on high-risk investments in penny stocks. [Compl. ¶ 13, Dkt. 1; Defs.' Ans. ¶ 13, Dkt. 21.]

Carebourn was created in 2009 by Jim Webourn and John Berger. Mr. Rice was not an yet officer of the company, but he was a partner. [Hutton Aff., Ex. A ("Rice Dep.") 16:6–17:2, Dkt. 134-1.] Carebourn's principal place of business is at Mr. Rice's personal residence in Maple Grove, and Carebourn pays rent to Linrick Industries Co. ("Linrick"), an entity owned by Mr. Rice's wife. [Defs.' Ans. ¶ 14; Rice Dep. 12:24–13:4; Stockwell Aff., Ex. 4 ("Rice SEC Test.")[2] 107:3–108:11, Dkt. 128-4.] Mr. Rice is the managing member of Carebourn and owns a percentage of it through Carebourn's general partner, Carebourn Partners, LLC (hereafter "Carebourn Partners"). [Compl. ¶¶ 14, 15; Defs.' Ans. ¶¶ 14, 15; Stockwell Aff., Ex. 5 ("Logan Rice Dep.") 32:19–24, Dkt. 128-5.] Carebourn has two other members. [Compl. ¶ 15; Ans. ¶ 15.]

Neither Carebourn nor Carebourn Partners registered with the SEC as securities dealers, and neither was ever associated with a registered dealer during the period

---

[2] Additional excerpts from Mr. Rice's SEC investigative testimony are found at docket entry 143-1.

relevant to this dispute. [Rice Dep. 31:21–32:25.] Mr. Rice himself has never registered with the SEC as a securities dealer. [Rice Dep. 33:1–4.]

From at least 2014 through 2019, Mr. Rice was solely responsible for Carebourn's day-to-day operations. He explained that he had the "final say on everything [and] [n]o one else has any say on anything except me," including in which companies Carebourn invested. [Rice SEC Test. 91:10–92:1; Rice Dep. 24:10–14 ("I make the actual decision at the end of the day.").]

### Carebourn's Business

Beginning in 2013, Carebourn's business exclusively involved making loans to small start-up companies. [Rice Dep. 34:24–35:5.] Most of the investments Carebourn made were through the use of "convertible promissory notes." [Rice Dep. 37:9–38:15.] Carebourn provided funding to the small public companies, referred to as "issuers," in exchange for the convertible notes. [Rice SEC Test. 217:17–218:19; Logan Rice Dep. 50:16–23.] The issuers tended to be high-risk companies without significant assets or revenue, and they traded on public markets at sub-penny or microcap prices. [Rice SEC Test. 86:20–87:16; Stockwell Aff., Ex. 10 ("Wruck Dep.") 21:19–23:2, Dkt. 128-10; Def.'s Suppl. ROGs at 10, 11.]

Many of the convertible notes included very similar terms.[3] [*See, e.g.*, Stockwell Aff., Exs. 8 & 9; McShane Decl. ¶ 7, Dkt. 129.] Generally, Carebourn provided funds to the issuer, which the contracts referred to as the "principal amount." But many of the notes included terms where the issuer would actually receive less than the full principal amount, which was referred to as the "purchase price." The purchase price reflected deductions from the principal amount for an "original issue discount" or "OID," and for legal fees, accounting fees, and other transactional costs. [*E.g.*, Stockwell Aff., Ex. 8; McShane Decl. ¶ 8.]

As the name suggests, the convertible promissory notes allowed Carebourn to convert all or any portion of the issuer's indebtedness into newly-issued shares of the company's stock. [Stockwell Aff., Ex. 8 at 2, § 1.1 (providing the Holder of the note a "Conversion Right" at any time after the date of the Note).] The notes often allowed Carebourn to obtain the shares at a significant discount from the prevailing market price at the time of the conversion. [*E.g.*, Stockwell Aff., Ex. 8 at 3, § 1.2 (providing for a 40% discount from the market price); *id.*, Ex. 9 at 3 § 1.2 (45%); *id.* Ex. 13 at 3 § 1.2 (50%).] This meant that if the issuer's stock price dropped, Carebourn could still realize a return by converting newly-issued shares at a discount from the prevailing market price. [McShane Decl. ¶ 9; *see also* Stockwell Aff., Ex. 11 at 1.] Between January 1, 2017 and

---

[3] Over time, there certain small changes to the wording in the contracts. For instance, in 2015 Carebourn added an automatic payment term, also known as an "ACH," that would result in a periodic direct payment from an issuer's account to Carebourn for repayment of the loan principal. [Rice SEC Test. 125:12–126:1.]

September 24, 2021, Carebourn obtained 93 convertible promissory notes from 27

different issuers of stock and 18 convertible notes from third parties of 7 different issuers.

[McShane Decl. ¶ 5; *id.*, Ex. A, Dkt. 129-1.]

### *Defendants' Conversions and Sales of Shares*

To comply with the "safe harbor" of SEC Rule 144,[4] Defendants typically waited

at least six months before converting the notes. [Def. Suppl. ROGs at 2; Rice Dep. 71:7–

18; Rice SEC Test. 140:15–141:7.] Carebourn's notes prevented conversions that resulted

in Defendants owning more than 5% or 10% of the issuer's stock at any given time,

which avoided triggering SEC filing restrictions under 17 C.F.R. § 240.13d-1 and SEC

Schedules 13D and 13G. [Rice Dep. 65:24–66:5; Def. Suppl. ROGs at 10; *e.g.*, Stockwell

Aff., Ex. 8 at 2, § 1.1; Rice SEC Test. 142:8–144:19.] Mr. Rice tracked when

Carebourn's notes were eligible to be converted according to this model, and Carebourn

would normally convert eligible shares under a single note on multiple occasions. [Rice

Dep. 68:19–70:9 (Rice tracking); Def. Supp. ROGs at 10 (multiple conversions); Rice

SEC Test. 145:16–24 (multiple conversions).]

---

[4] 17 C.F.R. § 230.144 (SEC Rule 144). Generally, when a person sells a security to another, the sale has to be registered unless an exemption applies, and Section 4(a)(1) of the Securities Act creates one such exemption for "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). The SEC adopted Rule 144 to establish a "safe harbor" from the broad definition of "underwriter" in 15 U.S.C. § 77b(a)(11). *See* 17 C.F.R. § 230.144, Preliminary Note. One of the conditions of benefiting from the "safe harbor" of SEC Rule 144 is that "a minimum of six months must elapse between ... the acquisition of the securities from the issuer ... and any resale of such securities[.]" 17 C.F.R. § 230.144(d)(1)(i).

"As soon as the holding period was ... over, [Carebourn] would start the conversion." [Rice SEC Test. 183:9–11; Logan Rice Dep. 75:1–10; *see* Lai Decl. ¶¶ 9–11 (describing PetVivo transaction), Dkt. 130.] Carebourn would convert as much stock as the 4.99% ownership cap would and as much as the market would bear at any given time. [Rice SEC Test. 184:2–185:4.] Carebourn "never defaulted an issuer" as a result of the issuer failing to repay the principal within the one-year maturity date and was willing to continue working with an issuer so long as the company continued to have shares for Carebourn to convert.[5] [Rice SEC Test. 171:2–172:13, Dkt. 143-1.]

On a few occasions Carebourn purchased older convertible note securities, or "aged debt," from a third party. [Stockwell Aff., Exs. 15 & 16.] These aged-debt transactions potentially allowed Carebourn to convert shares without having to wait the full six-month holding period because the original purchaser of the note had already held the notes for the required period, so they could be converted immediately. [Wruck Dep. 103:8–19; Stockwell Aff., Ex. 16 at 1 (Issue date 11/28/2017) & *id.* at 14 (Assignment Agreement to Carebourn dated 5/4/2018); Stockwell Aff., Ex. 15 (4/10/2015 original note and 10/12/2015 sale to Carebourn).]

---

[5] When Mr. Rice was deposed two years after he testified that Carebourn never defaulted an issuer, he stated that Carebourn "converted after a default off of a lending process and received shares." [Rice Dep. Test. 53:3–10.]

Once Carebourn converted a promissory note into shares of an issuer's stock, the issuer's transfer agent[6] would deposit that stock into one of Carebourn's several brokerage accounts. [Rice Dep. Test. 78:12–79:3; McShane Decl. ¶ 12 (listing brokerage accounts).] In one example of such a transaction Carebourn obtained a convertible note from Optec International, Inc. (OPTI), on August 6, 2019 and converted $19,018.69 of the balance into 437,915 shares of OPTI's common stock. The conversion price was $0.04343, while the "market price" under the terms of the note was $0.10100. Without the discounted conversion price, Carebourn would have paid $44,229.42 for 437,915 shares, but instead it paid only $19,018.69. [McShane Decl. ¶ 11 & Ex. C.]

Once the shares were deposited in Carebourn's brokerage accounts, Mr. Rice would contact the brokers and instruct them to sell the stock into the open market. [Def.'s Suppl. ROGs at 3; Stockwell Aff., Ex. 36 ¶ 22.] Of the 336 conversions the SEC reviewed, Carebourn began selling shares in 287 instances within 7 days after the shares were deposited into a brokerage account, and for 163 of the conversions, the shares were completely sold within 7 days of deposit. [McShane Decl. ¶ 23.]

From January 1, 2017 through September 24, 2021 Carebourn deposited over 18 billion shares of stock from 31 different issuers into its brokerage accounts and sold just

---

[6] Among other things, transfer agents are trust companies and banks that "[i]ssue and cancel certificates to reflect changes in ownership" of shares of publicly traded securities and "keep records of who owns a company's stocks and bonds and how those stocks and bonds are held." U.S. Sec. & Exchange Comm'n, Transfer Agents, https://www.sec.gov/fast-answers/answerstransferagent (last accessed September 27, 2023). Brokers buy and sell securities for clients on the open market and usually earn commissions for trades.

under 18 billion shares of stock from 33 different issuers over the same period. [McShane Decl. ¶ 13.] Over that span, Carebourn "purchased 93 convertible notes from 27 different issuers, purchased 18 convertible notes of 7 issuers from third parties, and converted shares of 37 convertible notes across 23 different issuers purchased prior [to January 1, 2017]." [*Id.* ¶ 15.] Carebourn spent $17,499,051.84 on convertible notes during this period, paid $212,130.01 in closing fees to service providers, including auditors and lawyers. [*Id.*] Carebourn's gross revenue from stock sales exceeded $26 million during this period. [*Id.* ¶ 16.] Carebourn obtained nearly $5 million in repayments of principal on convertible notes, just over $500,000 from the sale of convertible notes, and $22,500 from fees charged to two issuers. [*Id.* ¶ 17.] The SEC calculated Carebourn's net profit, excluding fees paid to Carebourn Partners, as $13,949,959.97. [*Id.* ¶ 19.]

### *Carebourn's Contractors*

Carebourn used the services of independent contractors. Carebourn hired Mike Wruck, who formed his own company "More Capital LLC," to provide services for Carebourn from 2015 to 2016. [Rice Dep. 177:8–178:21; Wruck Dep 21:5–22:7.] Mr. Wruck assisted Carebourn in identifying potential issuers in which Carebourn could make investments through convertible debt financing. [Rice Dep. 178:22–180:15; Wruck Dep. 22:10–24:16, 57:11–16.] Because Mr. Rice had gotten busy and needed assistance, Mr. Rice would send Mr. Wruck a list of companies to vet, and Mr. Wruck would review their balance sheets and conduct due diligence. [Wruck Dep. 21:19–22:7, 59:8–60:1.] Mr. Wruck would occasionally contact the companies he was vetting for Carebourn, including calling their officers to verify that he was reviewing the correct financial

information and make an introduction on behalf of Carebourn. [Wruck Dep. 53:25–54:19; Rice Dep. 192:9–19.] Mr. Wruck estimated that while he was conducting due diligence for Carebourn he looked at between 100 and 200 companies as potential convertible-debt-financing investment opportunities. [Wruck Dep. 55:20–56:11.]

From around 2013 through 2015, Logan Rice, Mr. Rice's son, and his company Booski Consulting LLC, providing accounting and bookkeeping services to Carebourn. [Rice Dep. 167:17–168:9; Logan Rice Dep. 22:2–22.] In exchange for those services, Carebourn paid Booski a commission based on net proceeds from the sale of stock. [Rice Dep. 191:2–7.] Carebourn also engaged Booski as an independent contractor from 2018 through 2020, agreeing to pay Booski a 7.5% commission on the net sale of debt conversions from conversion opportunities that Booski acquired. [Stockwell Aff., Ex. 19.] However, Mr. Rice testified that Booski was never "slated to find or identify potential issuers." [Rice Dep. 189:21–22.]

Chip Rice also worked as a consultant for Carebourn. He performed these consulting services for Carebourn through Linrick, his wife's company. [Rice Dep. 173:14–25, 175:11–16.] Linrick, like Booski, received a 7.5% commission based on net stock sales. [Rice Dep. 176:22–177:7.]

### *Defendants' Website and Solicitation*

Defendants operated and maintained a public website—www.carebourncapital.com—from 2013 to 2020. [Castillo Decl. & Ex. 1, Dkt. 136, 136-1.] The website identified Carebourn as a "nationally recognized financial company" that is willing to provide funding to smaller businesses incapable of obtaining "traditional

funding." [Castillo Decl., Ex. 1 at 1.] It also advertised "Debt Purchasing Financing, Private Placement Funding, Commercial Bridge Loans, Credit Card Cash Advance, Accounts Receivable Financing, & Business Acquisition Loans." [*Id.*, Ex. 1 at 2.] The website's "Financial/Capital Offerings" page included "convertible debenture" opportunities to "provide[] direct capital infusion in the company"; offering "[l]ow cost of capital that can be used to fund future growth opportunities"; and advertising that "[c]onversion price and timing of conversion is agreed on an individual basis." [*Id.*, Ex. 1 at 4.] Mr. Rice had authority over the content of the website. [Rice Dep. 199:22–25.]

In addition to the website, Carebourn solicited business from other penny stock issuers. One method was Mr. Rice cold-calling and emailing companies to gauge interest in convertible-note financing. [Rice SEC Test. 98:18–99:2; Stockwell Aff., Ex. 30 (email).] Carebourn found other companies through Mr. Rice's industry contacts and referrals from brokers, attorneys, and other issuers. [Rice SEC Test. 97:1–21; Rice Dep. 122:10–22; Defs.' Suppl. ROGs at 3.] Mr. Rice and Logan Rice traveled to several micro-cap conferences in multiple cities to meet with companies one-on-one to identify opportunities. [Rice SEC Test. 97:22–98:9; Rice Dep. 131:5–134:25; Defs.' Suppl. ROGs at 3, 9; Lai Decl. ¶ 6.] And Carebourn paid third parties finders fees or referral fees for bringing Carebourn opportunities. [Stockwell Aff., Exs. 31–33 (noting payments to More Capital LLC and Forefront Consultants LLC as finder's fees); Rice SEC Test. 162:8–21.]

## DISCUSSION

### I.   Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Irvin v. Richardson*, 20 F.4th 1199 (8th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 10131, 1042 (8th Cir. 2011) (en banc).

"When considering [the SEC's] Motion, the Court views the record in the light most favorable to [Defendants], and when considering [Defendants'] Motion, the Court views the record in the light most favorable to [the SEC]." *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

## II.    The SEC's Motion

The SEC argues that the undisputed factual record demonstrates that Defendants Carebourn and Mr. Rice were engaged in the regular business of buying and selling securities, which means that they fit the Exchange Act's definition of a "dealer," and therefore violated the Act's registration requirement. [Dkt. 127 19–27; Compl. ¶¶ 58–60 (Count I).] It further argues that it is entitled to summary judgment on its claim that Carebourn Partners received fees that were charged to the penny stock issuers as a result of that unregistered dealer activity and is therefore liable for its receipt of ill-gotten gains, unjust enrichment, or both. [Dkt. 127 at 13, 27–28; Compl. ¶¶ 61–64 (Count II).] Defendants' arguments in opposition to the SEC's motion are legion, but even when viewed in the light most favorable to the Defendants [Dkt. 145; *see also* Dkt. 133], the Court finds that the SEC is entitled to summary judgment in its favor.

### A.  Count I – Unregistered Dealer Activity

The SEC seeks summary judgment in its favor on Count I of its Complaint, which asserts that Carebourn and Mr. Rice violated Section 15(a)(1) of the Exchange Act (15 U.S.C. § 78o(a)(1)) by buying and selling securities as part of a regular business while failing to register as dealers with the SEC themselves or to associate with any registered dealer. To show a violation, the plain language of the statute requires the SEC to

demonstrate that: (1) a broker or dealer; (2) used the mails or any means or instrumentality of interstate commerce; (3) to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security; and (4) failed to register with the SEC or to associate with an entity registered with the SEC. Because the Exchange Act further defines what it means to be a "dealer," the SEC must also demonstrate that the defendant (1) engaged in the business of buying and selling securities; (2) for his own account; either (3) through a broker or otherwise. 15 U.S.C. § 78c(a)(5)(A). If the evidence shows that the defendant buys or sells securities for his own account, "but *not as a part of a regular business*," then he or she is not a dealer, *id.* § 78c(a)(5)(B) (emphasis added), and is not required to register. But neither the Supreme Court nor the Eighth Circuit has articulated a framework for determining whether the SEC has proved a violation of this registration requirement.

### 1. Uncontested Issues

There are several issues raised in the SEC's motion that the Defendants have not meaningfully contested. First is the issue of whether Carebourn's and Mr. Rice's conduct involved the use of the mails or any means or instrumentality of interstate commerce. The evidence shows that they did. Mr. Rice made interstate phone calls to issuers to discuss Carebourn's convertible debt financing, sent emails to issuers about the same, and traveled interstate to micro-cap conferences to meet with companies who might be interested in Carebourn's operation. Nowhere do Defendants point to evidence suggesting there is a genuine dispute of fact on this issue and the Court finds there is none.

Second, by failing to address it, Defendants have conceded that neither Mr. Rice nor Carebourn ever registered with the SEC as a dealer. Similarly, there is no dispute that neither Mr. Rice nor Carebourn ever *associated* with any entity that was registered with the SEC as a dealer. Mr. Rice admitted as much in his deposition testimony.

Third, Defendants have not contested, and the evidence plainly establishes,[7] that Defendants' conversions of stock and the sales of shares into the public market occurred for Carebourn's own account and through a broker or otherwise, within the meaning of 15 U.S.C. § 78c(a)(5)(A).

However, Defendants raise a host of arguments as to the remaining issues the SEC must establish to prevail on its unregistered-dealer claim. These include (1) whether Defendants engaged in buying and selling securities; and (2) whether Defendants did so as part of a regular business. The Court addresses each issue below.

### 2.  Buying and Selling a Security

The SEC contends that promissory notes are a type of security under 15 U.S.C. § 77b(1). Further, the SEC asserts that Defendants invested by purchasing convertible promissory notes from penny stock issuers (i.e., purchasing a security), then converted those notes into shares of the issuing companies' stock, which they sold through their brokerage accounts. Stocks, the SEC points out, are another type of security. 15 U.S.C. § 77b(1). Thus, the SEC contends, the undisputed evidence shows that Defendants

---

[7] Mr. Rice testified that the converted notes were held and acquired for Carebourn's own account. [Rice SEC Test. 202:5–10.]

bought and sold securities within the meaning of the Exchange Act and the dealer definition.

The Court agrees. There is no genuine dispute that that between January 1, 2017 and September 24, 2021, Carebourn purchased 93 convertible promissory notes for 27 different issuers of stock. Over that same period, it purchased 18 convertible notes from third parties of 7 different issuers; it converted billions of shares of stock from those notes and deposited them into its various brokerage accounts; and it sold billions of shares of the converted issuers' stock into the market through its brokers. [McShane Decl. ¶ 5.] This conduct—buying convertible promissory notes, converting them into shares of the issuing companies' stock, and then selling the issuers' stock—constitutes buying and selling securities within the meaning of 15 U.S.C. § 78c(a)(5)(A).

Defendants argue otherwise, primarily contending that the SEC cannot prevail on its unregistered-dealer claim because "Defendants did not 'buy and sell' securities...." [Dkt. 145 at 4.] Defendants suggest that no purchase of a security occurred when Carebourn executed its convertible notes with the issuing penny stock companies because (1) Defendants never received any shares unless there was a default in the payment of the loan; and (2) any purchase of a security would result in a purchase receipt of a stock certificate, and the SEC cannot point to evidence of such a certificate. [Dkt. 145 at 6–7; *see also* Dkt. 133 at 11–13.]

These arguments are unsupported by the record. Although it is true that some of the notes contained provisions that allowed Defendants to convert shares if the issuing companies defaulted under the convertible notes, Defendants point to no record evidence

to support the contention that they *never* received any shares *unless* there was a default in the payment of the loan. Fed. R. Civ. P. 56(c)(1)(A) (requiring a party asserting that a fact is genuinely disputed must support the assertion by citing to particular materials in the record). In fact, the evidence squarely belies this argument. Convertible notes containing default provisions also gave Carebourn the right to convert all or part of the principal amount of the note "from time to time, and at any time after the date of [the] Note...." [*E.g.*, Stockwell Aff., Ex. 8 § 1.1.] The fact that Defendants *could* convert upon a default does not change the fact that the notes regularly allowed conversion even if no default occurred.

Moreover, Defendants' reliance on Mr. Rice's deposition testimony fails to create a *genuine* factual dispute on this issue. "It is well-settled that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *Garang v. City of Ames*, 2 F.4th 1115, 1122 (8th Cir. 2021) (quoting *Botton v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020)). When Mr. Rice testified during the SEC's investigation, he admitted that Defendants never defaulted any issuer for failing to meet their one-year repayment obligations. He further testified that Defendants would instead opt to continue working with issuers so long as Carebourn could continue converting any remaining indebtedness into shares. And he admitted that Defendants began converting notes as soon as the six-month holding period under SEC Rule 144 had expired, regardless of the issuers' compliance with any repayment terms. [Rice SEC Test. 183:4–184:1.] This makes the default provisions irrelevant. However, when he was deposed in this action, Mr. Rice suggested that Carebourn was simply "a

17

lender," and only obtained shares "in the process of default." [Rice Dep. 52:19–53:10.] This subsequent inconsistency in Mr. Rice's testimony is unexplained, and somewhat troubling, but it cannot now be used to manufacture a fact issue where none existed before.

Defendants next argue that "[t]he Commission states that 'notes are a type of security.' This is not true." [Dkt. 145 at 6 n.8.] Defendants' position is, unfortunately, emblematic of their opposition—they do not elaborate on this argument and cite no authority to support it. Of course, the very first line of the statutory definition cited by the SEC in support of the assertion that notes are, in fact, a type of security states that very thing quite plainly. 15 U.S.C. § 77b(a)(1) ("The term 'security' means *any note*, stock, [etc....]") (emphasis added); *Briggs v. Sterner*, 529 F. Supp. 1155, 1166 (S.D. Iowa 1981) ("A convertible debenture, which can be analogized to an option or entitlement to purchase shares, is considered a security within the contemplation of both the Securities Act and the Securities Exchange Act."). Defendants appear to be grasping at straws.

Defendants next argue that their inclusion of ACH[8] repayment provisions in their convertible note products means that they did not purchase any securities. They suggest that if an issuer's debt was fully repaid via the ACH electronic fund transfer, then the Stock Purchase Agreements that accompanied the convertible notes would be rendered

---

[8] "An ACH is an electronic fund transfer made between banks and credit unions across what is called the Automated Clearing House network. ACH is used for all kinds of fund transfer transactions, including direct deposit of paychecks and monthly debits for routine payments." Consumer Financial Protection Bureau, *What is an ACH?*, https://www.consumerfinance.gov/ask-cfpb (last accessed September 27, 2023).

invalid, undermining the SEC's suggestion that Defendants' purchased securities. [Dkt. 145 at 2–3, 7; *see also* Dkt. 133 at 10–11.] Defendants fail to support this argument with evidence. They point to no evidence to suggest that all their convertible notes even contained ACH provisions. Nor have Defendants shown that a single penny stock issuer from whom they obtained a convertible note repaid the principal through the ACH payments.

In fact, the record belies Defendants' assertions. Although Defendants suggest that the Court "can distinguish the act of 'buying' where Carebourn received money to pay off the debt" [Dkt. 133 at 23], the reality was that the ACH payments had "a lot of issues ... because the companies would pull their ACH accounts. ... [I]t worked for a while, but not very long." [Logan Rice Dep. 83:14–17.] Mr. Rice explained that the ACH payments were really a way for Carebourn to obtain some cash flow from the issuers based on what the companies could afford, but they never prosecuted any failures of ACH payments because the business would have accomplished some reduction of its debt through the payments already made, and Carebourn always had the right to obtain capital returns once they got to the six-month conversion date. [Rice SEC Test. 174:25–177:3.] Thus, to the extent that Defendants contend that the factual record surrounding the ACH payments necessitates a trial so that a fact-finder can determine whether they were engaged in purchasing securities, the Court disagrees. The simple fact is that the ACH payments changed nothing about Defendants' conversion rights.

Defendants have elsewhere argued that they did not purchase any securities because "the primary purpose [of the convertible notes was] for the company to re-pay

the debt with interest," and "[i]n fact, many companies that the SEC cites in their Complaint paid their debt." [Dkt. 133 at 13.] Again, however, Defendants fail to support these assertions with any citation to record evidence. The Court is not "required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996).

Defendants repeat an argument they raised in support of their motion for judgment on the pleadings. They suggest that they did not buy and sell securities because they did not buy and sell the same type of security, in the same condition, around the same time. [Dkt. 133 at 20–25.] They rely on the same set of cases decided in the years before the passage of the original federal securities statute, where state courts reviewed their own states' laws applicable to "dealers" of certain goods, and contend that they cannot qualify as dealers based on similar reasoning employed in those actions.[9] Defendants' reliance on these cases is just as misplaced as it was when they raised this argument the first time

---

[9] *State v. Yearby*, 82 N.C. 561, 562 (N.C. 1880) (examining a licensing statute and concluding that a butcher is not a dealer because a butcher does not buy and sell the same article in the same condition); *Kansas City v. Butt*, 88 Mo. App. 237, 239–40 (Mo. Ct. App. 1901) (interpreting a licensing law applicable to "ice dealers" to exclude manufacturers who transform raw materials); *State v. San Patricio Canning Co.*, 17 S.W.2d 160, 162–63 (Tx. Ct. Civ. App. 1929) (holding that a shrimp canner was not a dealer within the meaning of a licensing and tax statute because the raw material, shrimp, was not resold in the same state in which it was purchased).

around, and it is rejected for precisely the same reasons. [Order (May 24, 2022) at 13–14, Dkt. 76.]

For all these reasons, the Court rejects Defendants' arguments that they were not "buying and selling" securities within the meaning of 15 U.S.C. § 78c(a)(5)(A) and therefore do not meet the Exchange Act's definition of a "dealer."

### 3.  Regular Business

The parties next dispute whether Defendants were engaged in the *regular business* of buying and selling securities such that they were dealers subject to the Exchange Act's registration requirement. Unfortunately, the statute itself does not define what it means to be engaged in the business of buying and selling securities and the dealer definition does not further illuminate what it means to buy and sell securities as part of a regular business. But although neither the Supreme Court nor the Eighth Circuit has resolved the issue, there is some guidance in the caselaw.

### a)  Caselaw

Previous decisions exploring whether someone is engaged in the "regular business" of buying and selling securities have focused on the sheer volume of a person's activity. The Eighth Circuit has indicated that a high volume of buying and selling securities can be indicative of engaging in a regular business triggering the dealer-registration requirement. *See SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (concluding that defendant was a dealer where he engaged in a "level of activity" that "made him more than an active investor"). Other courts have similarly asked whether the involvement in buying and selling securities "'involves more than a few isolated

21

transactions.'" *SEC v. Keener*, 580 F. Supp. 3d 1272, 1282 (S.D. Fla. 2022) (quoiting *In re Application of Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at *4 (Sept 2, 1992)); *SEC v. Fierro*, Civil Action No. 20-02104 (GC), 2023 WL 4249011, at *5 (D.N.J. June 29, 2023) (considering volume of activity).

Courts also consider the amount of profit generated and the extent to which the conduct involved resembles a commercial enterprise. Although it was interpreting the Securities Act of 1933 rather than the Exchange Act, the Eleventh Circuit noted the similarities in the two statutes' "dealer" definitions and explained that "the centerpiece to [the dealer] definition is the word 'business,' which is defined as 'a commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood or gain*.'" *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015) (emphasis in original) (cleaned up) (quoting Black's Law Dictionary 239 (10th ed. 2009)); *Keener*, 580 F. Supp. 3d at 1282 (citing *Big Apple*, 783 F.3d at 809); *SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1272 (S.D. Fla. 2020) (same).

The relatively recent summary judgment decisions in *Keener* and *Almagarby* are instructive because both cases involved conduct very close to Defendants' convertible note business in this case. The *Keener* court found that the defendant operated as a "dealer" because it was undisputed that over a three-year period, he converted more than 100 convertible notes from more than 100 different microcap issuers and liquidated billions of shares of those issuers' converted common stock, generating approximately $10 million in net proceeds from the transactions. 560 F. Supp. 3d at 1286. The court also relied on evidence showing that the defendant had his employees contact companies to

inquire about their interest in selling convertible notes, developed software to find notes for sale, and advertised his interest in buying convertible notes on a website. *Id.* at 1287. Also indicative of buying and selling as part of a regular business were the facts that the defendant acquired stock at a 10% to 50% discount before reselling it to the public at market price and that he sponsored and attended conferences to find potential issuers for convertible notes. *Id.* at 1288–89.

The facts supporting the court's summary judgment decision in *Almagarby* were quite similar to those in *Keener*. The *Almagarby* court found that the defendants acted as an unregistered dealer where they "purchased securities from Issuers at deep discounts and sold them back on the market for profit," with the express goal of making money as quickly as possible. 479 F. Supp. at 1272. Like the defendant in *Keener*, over a three-year period, Mr. Almagarby engaged in a high volume of convertible note transactions—962 sales of shares—and generated significant revenue—more than $2.8 million in proceeds. *Id.* at 1268, 1272. The *Almagarby* court also relied on the fact that the defendant employed "finders" to identify potential issuers. *Id.*

Other cases have focused on similar criteria in evaluating whether a person acts as a dealer under the Exchange Act. *E.g.*, *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853, 858–59 (N.D. Ill. 2019) (noting high volume of defendant's sales of shares, millions in profit, defendant's use of website to advertise willingness to buy securities, purchases of stocks at discounted prices from many issuers, and making a profit based on marked-up price, not merely on increase in share price); *SEC v. Offill*, No. 3:07-cv-1643-D, 2012 WL 246061, at *7 (N.D. Tex. Jan. 26, 2012) (considering "[r]egularity of participation"

illustrated through the "dollar amount of securities sold . . . and the extent to which advertisement and investor solicitation were used") (quoting *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 12–13 (D.D.C. 1998)).

### b) Defendants' Conduct

The Court finds that there is no genuine dispute that Carebourn and Mr. Rice bought and sold securities as part of a regular business. The SEC has shown that Defendants engaged in a high volume of buying and selling securities, namely purchasing convertible promissory notes from microcap or penny stock issuers, converting those notes into shares of newly issued common stock, and then reselling those shares into the market. As the Court explained above, between January 1, 2017 and September 24, 2021, the evidence shows that Carebourn purchased 93 convertible promissory notes from 27 different issuers of stock. Over that same period, it purchased 18 convertible notes from third parties of 7 different issuers; it converted billions of shares of stock from those notes and deposited them into its various brokerage accounts; and that it sold billions of shares of the converted issuers' stock into the market through its brokers. [McShane Decl. ¶ 5.] During this timeframe, Carebourn deposited 18 billion shares of convertible stock with its brokers and sold over 17.9 billion shares of stock. [*Id.*] Although Carebourn had over $17.7 million in expenditures associated with these transactions during this period, its total cash receipts connected to its convertible note business was over $31.6 million during the same period, yielding a net income of over $13.9 million. [*Id.* ¶¶ 14–19.] Carebourn received over $1 million in transaction fees charged to issuers

24

as part of the convertible note transactions. [*Id.* ¶ 20.] These facts all indicate dealer activity.

Additional undisputed evidence demonstrates that Carebourn and Mr. Rice acted as unregistered dealers during this period. Carebourn's website included a page that advertised convertible debenture opportunities and suggested that the conversion price and timing of conversion would be agreed to on an individual basis. Mr. Rice cold-called issuers soliciting their convertible debt business. The undisputed evidence also shows that Carebourn and Mr. Rice used the services of finders, including Mr. Wruck and Logan Rice, who received referral fee payments when they brought an opportunity to Carebourn that materialized into a convertible note transaction. Moreover, there is no dispute that Mr. Rice and his son traveled to several microcap conferences looking to identify potential issuers to solicit for Carebourn's convertible note business. These facts all support a finding that Carebourn and Mr. Rice violated the dealer-registration requirement because they were engaged in the regular business of buying and selling securities.

### c) Defendants' Factual Arguments

Defendants' arguments that their buying and selling of securities was not part of a regular business are unavailing and do not point to a genuine dispute regarding a material fact. First, Defendants suggest that their business was not solely purchasing convertible promissory notes from regulated public companies because they also invested in unregulated private companies with no convertible stock to be sold into a public market. [*E.g.*, Dkt. 145 at 6.] However, this argument does not defeat the SEC's summary

judgment motion because it is immaterial whether Defendants also made investments in
private companies. Defendants point to no evidence to dispute the SEC's showing that
they engaged in the high volume of convertible note transactions involving publicly
traded penny stock companies, and these are the activities that required dealer
registration.

Defendants next suggest that their conduct did not include the kind of solicitation
and advertising that supported findings of unregistered dealer activity in other cases. For
example, they argue that Mr. Rice did not engage in significant "cold-calling" and only
made one such call to a long-time friend; that Mr. Wruck's involvement only occurred
because he had his own business making similar investments; and they did not advertise
at any trade shows or conferences.[10] [Dkt. 145 at 11–12.] But even if proven, none of
these arguments provides a basis for concluding that they were not engaged in buying and
selling securities as part of a regular business. First, with respect to the issue of cold-
calling or otherwise soliciting issuers, the evidence in the record undermines Defendants'
unsupported assertion. Indeed, Mr. Rice testified that he cold-called investors. [Rice SEC
Test. 98:10–99:2; Rice Dep. 124:17–125:6.] He also emailed issuers about Defendants'
offers to provide funding through convertible notes. [Dkt. 128–30.] And he used his

---

[10] Defendants also assert that they never advertised using "brochures, mass mailers, or
sales teams [n]or otherwise to promote their business." [Dkt. 145 at 15.] Mr. Rice
testified in his deposition that Carebourn did not have brochures or mass mailers, but the
Court finds this does not create a genuine issue of material fact. The undisputed evidence
clearly demonstrates that Defendants, in a variety of ways, held themselves out to the
public as being in the business of buying and selling securities, i.e., convertible
promissory notes, and solicited that business from potential issuers.

industry contacts to find out about penny stock companies who might sell him convertible notes. [Defs.' Suppl. ROGs at 3; Rice SEC Test. 97:1–14.] Second, Defendants fail to identify any record evidence suggesting that Mr. Wruck was retained for any reason other than because Carebourn's volume of business was significant. But even if some other reason were suggested by the record, that would not constitute a material factual dispute for trial. And finally, even if Defendants did not actually present at any of the conferences or trade shows that Mr. Rice attended, they have pointed to no evidence rebutting the SEC's showing that he attended those conferences in at least nine different cities, met microcap issuers there who could possibly sell Defendants convertible notes, discussed Carebourn's convertible debenture business with them, and eventually purchased convertible notes as a result of those activities. [Rice SEC Test. 97:1–98:9; Rice Dep. 125:22–126:19, 128:3–129:4, 133:8–16; Logan Rice Dep. 127:2–128:25; Dkt. 130 ¶ 6.] Giving an official presentation is certainly not the only way to use a conference to develop or promote a business.

Defendants next contend Mr. Rice does not actually control Carebourn.[11] They assert that a group of partners participate in making the company's decisions and that

---

[11] Defendants argue that Rice is "not a control person" under Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...."). But that section is irrelevant to the analysis here. The SEC does not allege control-person liability against Mr. Rice, but rather that he is directly liable for unregistered-dealer activity. [Compl. ¶¶ 17–19, 58–60.]

Carebourn Partners "manages what happens in the transactions." Meanwhile Carebourn

Capital's partners allegedly communicate regularly "about the investments that are made"

and "discuss each investment with each other before decisions are made." [Dkt. 133 at 9–

10.] In support of this attempt to demonstrate a fact dispute, Defendants again point to

Mr. Rice's deposition testimony where he provided a lengthy explanation of an alleged

"consensus" decision-making process involving input from the various limited partners

that make up the business structure of Carebourn. [Rice Dep. 20:17–28:11.] However,

Defendants' efforts on this point fall flat.

First, the "consensus" testimony flatly contradicts an admission in Defendants'

Answer to the Complaint. [Dkt. 21 ¶ 14.] But more importantly, it is the opposite of what

Mr. Rice testified to, under oath, during the SEC investigation.

> Q      Do you have the final say in which companies
> Carebourn would invest in?
>
> A      I have the responsibility. I take the
> responsibility and I am the final say on everything. No one
> else has any say on anything except me. That covers all the
> bases.

[Rice SEC Test. 91:10–15.] Elaborating further, he stated that no one other than himself

and his son was ever involved in the day-to-day operation of Carebourn, the investors are

purely passive investors who "have no say in anything," "have no idea," and who "know

not one thing about any company" in which Carebourn was making an investment. [Rice

SEC Dep. 91:16–92:1.] To put it plainly, having testified under oath one way, Mr. Rice

cannot change his testimony now to manufacture a fact dispute to avoid summary

judgment. This is the very definition of a sham issue.

Defendants assert that Carebourn was not profitable, that its "losses ... outweighed the profits," and that "the partners were never issued shares and only received the collection of proceeds sold from defaults on the loans." [Dkt. 133 at 11.] In his deposition, Mr. Rice disagreed with the statement that Carebourn generated millions of dollars in net profits from the sale of stock from convertible notes, that the "limited partners received both distributions on profits and losses," and the "losses outweighed the profits." [Rice Dep. at 85:20–86:15.] However, Mr. Rice's testimony is not corroborated by any other documentation, and Defendants point to no other evidence to prove that their convertible note business was not profitable. While the Court has an obligation to view disputed facts in the light most favorable to the nonmoving party, that does not extend to "so blatantly contradicted by the record that no reasonable jury could believe them." *Westwater v. Church*, 60 F.4th 1124, 1129 (8th Cir. 2023) (cleaned up) (quoting *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009)). Here, Mr. Rice's testimony regarding Carebourn's lack of profitability is blatantly contradicted by Carebourn's own financial statements, which showed significant net profits in 2014, 2015, 2016, 2017, 2018, 2019, 2020, and 2021. [Dkt. 128-6, 128-20, 128-21, 128-22, 128-23, 128-24.] Carebourn also provided a dividend to its partners out of its net profits every single quarter from the day it started business "without an exception." [Rice SEC Test. 159:10–21; Defs.' Suppl ROGs at 4; Rice Dep. 36:20–37:3.] And Mr. Rice himself admitted that "the point of the whole model was to make money by doing a convertible debt and giving distributions to our shareholders on a quarterly basis." [Rice SEC Test. 218:5–8.] Based on this record, the Court finds there is no genuine dispute that Mr. Rice

and Carebourn were engaged in the convertible note business for monetary gain, that the business was profitable, and that they used those profits to make distributions to Carebourn's partners.[12]

### d) SEC Rule 144

As described above, Defendants typically held onto the convertible notes at issue for a period of six months to comply with the "safe harbor" provisions of SEC Rule 144. Defendants argue that the SEC's motion must be denied (and that they are entitled to summary judgment) because their compliance with Rule 144 exempted them from the Exchange Act's dealer registration requirement.[13] But Defendants' reliance on Rule 144 is misplaced.

The Securities Act of 1933 provides that securities must be registered with the SEC before they can be sold or offered for sale. *See* 15 U.S.C. § 77e; *SEC v. Kern*, 425

---

[12] Defendants rely on a host of other statements in their brief opposing the SEC's motion for summary judgment that are entirely unsupported by any citation to the record. The Court has addressed several of these matters above, but certainly not all of them, and will not itemize them here. It is Defendants' obligation to point to specific evidence demonstrating an issue of fact for trial, and they have not done so here. In addition, the Court notes that although Defendants relied heavily on the multi-factored inquiry discussed in the SEC's Guide to Broker-Dealer Registration in seeking judgment on the pleadings [Dkt. 76 at 12–13], they have not placed similar emphasis on the Guide here. Accordingly, the Court has not addressed that issue in this decision.

[13] Defendants raise this argument in several places in a variety of ways, but they all boil down to the same thing—because we complied with SEC Rule 144, we didn't need to register as a dealer under Section 15(a)(1) of the Exchange Act. [Dkt. 133 at 6 ("But, most importantly, the Carebourn Defendants assert that they meet the exception of 4(a)(1) of the Securities Exchange Act within Rule 144."); *id.* at 17–19 (heading "Carebourn does not have to register per Rule 144 exemption"); *id.* at 45–46 (suggesting Rule 144-compliant transactions are "perfectly lawful"); Dkt. 145 at 2, 8–9, 13–15.]

F.3d 143, 147 (2d Cir. 2005). Under Section 4(a)(1) of the Securities Act, "transactions by any person other than an issuer, underwriter, or dealer" are exempt from that registration requirement. 15 U.S.C. § 77d(a)(1). The term "underwriter" is defined quite broadly as:

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking .... As used in this paragraph the term "issuer" shall include ... any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

15 U.S.C. § 77b(a)(11). Given the breadth of this definition, the SEC adopted Rule 144 to establish a "safe harbor." *See* 17 C.F.R. § 230.144, Preliminary Note. Its purpose is to "provid[e] clarification for those who acquire 'restricted securities'—securities that have never been publicly sold—from the issuer or controlling persons of the issuer ... and later seek to resell those securities to the public without registration." *SEC v. Sargent*, 589 F. Supp. 3d 173, 185 (D. Mass. 2022). People who acquired securities directly from the issuer could be viewed as having acquired securities "with a view to ... distribution" under § 77b(a)(11), making them "underwriters" who must register under the statute. But under Rule 144, a seller is not deemed an underwriter if, among other things "a minimum of six months [has] elapse[d] between ... the acquisition of the securities from the issuer ... and any resale of such securities[.]" 17 C.F.R. § 230.144(d)(1)(i) (setting forth the holding period). Critically, "a person who complies with Rule 144 must still show that he is neither an issuer nor a dealer to qualify for the 4(1) exemption." *Kern*, 425 F.3d at 148.

31

Defendants' compliance with Rule 144's six-month holding period is simply not material to the question of whether they were required to register as dealers under Section 15(a)(1) of the Exchange Act. *See Keener*, 580 F. Supp. at 1288 (noting that "Rule 144 provides a 'safe harbor' against underwriter status for the purpose of reselling unregistered securities into the market" but concluding that the defendant's compliance with the six-month holding period failed to create "a genuine issue of material fact regarding whether Defendant operated as a 'dealer' under the Exchange Act"). Defendants cite no authority that suggests one's compliance with the holding period under SEC Rule 144 negates the Exchange Act's requirement that one engaged in the regular business of buying and selling securities for his own account is a "dealer" who must register. In other words, although Defendants have relied heavily upon their compliance with Rule 144, the issue is a red herring.

### 4. Conclusion

Consistent with the discussion above, the Court concludes that the SEC has shown that there is no genuine dispute of material fact that Carebourn Capital LP and Chip Rice engaged in conduct that rendered them "dealers" within the definition of that term. In addition, the Court finds that there is no genuine dispute of material fact that in acting as dealers, Carebourn Capital and Chip Rice used the mails and other means or instrumentalities of interstate commerce to effect transactions in or to induce or attempt to induce the purchase or sale of securities, and did so while failing to register with the

SEC or to associate with an entity registered with the SEC. The Court finds that the SEC is entitled to summary judgment on Count I of its Complaint.[14]

### B. Affirmative Defenses

The SEC has also moved for summary judgment on Defendants' remaining affirmative defenses to liability.[15] These include a due process defense (Second Affirmative Defense); an estoppel defense (Third Affirmative Defense); a statute-of-limitations defense (Fourth Affirmative Defense); and an advice-of-counsel defense (Fifth Affirmative Defense). Defendants did not respond to the SEC's argument that these affirmative defenses fail as a matter of law based on the undisputed material facts,

---

[14] In January 2021, Carebourn filed a lawsuit against DarkPulse, Inc., one of the issuers from which it obtained convertible notes, in Hennepin County District Court. On April 21, 2023, Hennepin County Judge Patrick Robben granted DarkPulse's motion for summary judgment, concluding in part that Carebourn acted as an unregistered dealer under Section 15(a)(1) of the Exchange Act. [*Carebourn Capital, L.P. v. DarkPulse, Inc.*, No. 27-CV-21-1173 (Hennepin Cty. Dist. Ct. Apr. 21, 2023) (Order on DarkPulse, Inc.'s Motion for Summary Judgment), Dkt. 152-1.] Although the SEC argued that the state court's decision would have preclusive effect upon the entry of a final judgment [Dkt. 151 at 3–4], the Court notes that the state court litigation appears to be ongoing, and the Court does not address the preclusive effect, if any, of Judge Robben's decision.

[15] Defendants' Sixth, Seventh, Eighth, and Ninth Affirmative Defenses, respectively, assert that: injunctive relief is unavailable due to failure to allege a reasonable likelihood of future violations of the securities laws; a disgorgement award is not permitted in the absence of victims and a failure to limit the award to defendants' net profits; the SEC is not entitled to a penny stock bar against Defendants; and the SEC is not entitled to civil penalties. [Dkt. 21 at 9.] Because the SEC seeks summary judgment on liability only, the Court need not address these affirmative defenses in this Order. *SEC v. Fierro*, Civil Action No. 20-02104 (GC), 2023 WL 4249011, at *9 n.13 (D.N.J. June 29, 2023). In addition, the Court will not address the Defendants' Tenth Affirmative Defense (Unclean Hands) which was stricken in its April 12, 2022 Order [Dkt. 63 at 8–15], nor the First Affirmative Defense of failure to state a claim, the essence of which was addressed in the Court's denial of the Defendants' motion for judgment on the pleadings [Dkt. 76].

so any argument to the contrary is waived.[16] "It was [Defendant's] responsibility to show that there were genuine issues of material fact in the record that precluded the summary judgment [the SEC] sought." *Olson v. Macalester Coll.*, __ F. Supp. 3d __, 2023 WL 4353820, at *31 (D. Minn. July 5, 2023) (quoting *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734 (8th Cir. 2009)). In this case, Defendants failed to meet their burden.[17]

### Advice of Counsel

Only the advice-of-counsel defense merits some additional discussion, but it also fails to preclude summary judgment for the SEC.   Although Defendants failed to respond directly to the SEC's motion for summary judgment on their advice-of-counsel defense, they repeatedly invoke the advice letters they received from their attorneys in opposition, generally, to judgment in favor of the SEC. Even if these references in their briefing are sufficient to preserve the advice-of-counsel defense over the SEC's claim of waiver, viewing the evidence in the light most favorable to Defendants, the SEC is entitled to summary judgment on the merits of this defense.

---

[16] *See* Dkt. 145, *passim*; *see also* Dkt. 133.

[17] Even had the Defendants no waived any argument that the affirmative defenses regarding liability remain viable, the Court's review supports the SEC's arguments. Defendants have presented no reason for the Court to evaluate their due process defense any differently than the Court did in its Order denying their motion for judgment on the pleadings. [Dkt. 76 at 15–16.] Nor have they pointed to any evidence that this case involves the "very rare circumstances" where an estoppel defense might bar a government agency's claims. [Dkt. 63 at 7 (citing *Harding Cnty., S.D. v. Frithiof*, 575 F.3d 767, 777 (8th Cir. 2009) and *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000)).] And Defendants have not suggested that all of their conduct falls outside the applicable statutes of limitations.

Start with the evidence in the record. There is no dispute that Defendants sought opinion letters from various attorneys concerning specific transactions and their compliance with SEC Rule 144. For example, Defendants point to an opinion letter from attorney Jeff Turner, who was retained to analyze Carebourn's deposit and sale of over 4.1 million shares of common stock of Code Green Apparel Company under a 2018 convertible promissory note. The note was for $92,000, and in January 2021, Carebourn converted $21,116.14 of interest into the shares. [Hutton Aff., Ex. B ("Code Green Ltr."), Dkt. 134-2.] Mr. Turner's opinion letter includes a discussion of the Exchange Act's definition of "dealer" and suggests that the question "turns on two factual questions: (i) whether a person is 'buying and selling securities for its own account,' and (ii) whether a person engaged in that activity 'as part of a regular business.'" [Code Green Ltr. at 3.] Mr. Turner then discusses the need to distinguish between "traditional activities of a dealer from the activities of an investor," and examines three SEC no-action letters, a letter from the Office of Chief Counsel, and 1998 testimony from the SEC's Director. [Code Green Ltr. at 3–4.] Ultimately, Mr. Turner stated that he "believe[d] Carebourn and/or its managing members are not required to register as a broker-dealer under the Exchange Act." [Code Green Ltr. at 4.]

Defendants also retained attorney Laura Anthony to analyze Carebourn's conversion of 1 million shares of DarkPulse, Inc. pursuant to a convertible promissory note for $189,750.00. In February 2019, Carebourn converted $8,590.00 of the unpaid balance of the note into the shares of DarkPulse's common stock. [Hutton Aff., Ex. D, Dkt. 134-4.] And in another example, attorney Wendy Culbertson offered an opinion on a

different conversion of DarkPulse stock by Carebourn in February 2021 pursuant to the same $189,750.00 promissory note. [Hutton Aff., Ex. C, Dkt. 134-3.] These letters do not contain the same statements regarding dealer registration under the Exchange Act as Mr. Turner's Code Green letter.

The SEC deposed Mr. Turner and Ms. Anthony, and Ms. Culbertson provided a declaration concerning her engagement by Defendants. In his deposition, Mr. Turner testified that he provided Carebourn legal opinions "for restrictive stock transactions and stock that they had received ... and [he would] let them know if it was something we could move forward with or not." [Second Stockwell Aff., Ex. 3, Turner Dep. 23:18–24, Dkt. 143-3.] The opinions he prepared for Carebourn were limited to the specific transactions addressed by the opinion letter he provided, and his statement in the Code Green opinion letter regarding Carebourn's registration requirement was "transaction-specific." [Turner Dep. 29:24–30:3, 65:1–23.] However, no one at Carebourn ever asked him to advise them whether or not Carebourn needed to register as a dealer under the federal securities laws and he never provided any legal advice to anyone at Carebourn regarding that issue beyond what appeared in any of his opinion letters. [Turner Dep. 23:25–24:10.] Ms. Anthony and Ms. Culbertson testified similarly. [Second Stockwell Aff., Ex. 4, Anthony Dep 49:14–50:6, 50:25–51:4, Dkt. 143-4; Culbertson Decl. ¶¶ 9–11.]

Aside from these SEC Rule 144 opinion letters concerning specific transactions, Mr. Rice admitted that he never discussed with his attorneys whether Carebourn was a "dealer" under the securities laws. [Rice SEC Test. 194:11–195:20, 203:23–204:9.]

Defendants also never requested that the SEC issue a no-action letter. Nor did they make an interpretive or exemptive request to the SEC concerning their business activities. [Stockwell Aff., Ex. 3, Def.'s Ans. to Requests for Admissions at 2, Dkt. 128-3.] Mr. Rice never contacted the SEC to ask whether Carebourn's business activities made it a dealer. [Rice Dep. 230:18–22.]

When this factual record is considered in light of the requirements for raising an advice-of-counsel defense, it is clear that the defense is not viable here. "An affirmative defense is a defendant's assertion of facts and arguments that, if true, will *defeat* the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Safeway Transit LLC v. Discount Party Bus, Inc.*, 954 F.3d 1171, 1182 (8th Cir. 2020) (quoting *Defense*, Black's Law Dictionary (11th ed. 2019)) (cleaned up) (emphasis added by *Safeway Transit* court). When a defendant raises good faith reliance on the advice of counsel as a defense to a claim, he must "show that (i) he made a complete disclosure of the relevant facts to counsel; (ii) he received advice from counsel that the conduct in question was legal; and (iii) he relied on that advice in good faith." *SEC v. Leffers*, 289 Fed. App'x 449, 451 (2d Cir. 2008) (citing *Markowski v. SEC*, 34 F.3d 99, 104–05 (2d Cir. 1994)).

This Court has not identified a case suggesting that a person's good faith reliance on the advice of counsel *defeats* a claim that there was a violation of the registration requirement under Section 15(a)(1) of the Exchange Act. Carebourn does not point to any case suggesting that such reliance is a complete defense. And the SEC argues that such

reliance is merely a defense that can be raised to show that a defendant lacked specific intent, which is not a relevant consideration in this case.

There is support for the SEC's position. Reliance upon the advice of counsel is "evidence of good faith, a relevant consideration in evaluating a defendant's scienter." *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004); *see also SEC v. Welliver*, Civil No. 11-CV-3076 (SER), 2013 WL 12149244, at *14 (D. Minn. Apr. 30, 2013) (noting that reliance was not a complete defense to securities fraud claims, but a way to show lack of requisite intent). However, when scienter is not an element of a party's claim, the advice of counsel may not a viable defense at all. *SEC v. McNamee*, 481 F.3d 451, 455–56 (7th Cir. 2007) (concluding that reliance on the advice of counsel was not a defense in a civil-contempt proceeding where proof of scienter was not required). Section 15(a)(1) of the Exchange Act has no scienter requirement. *See Fierro*, 2023 WL 4249011, at *4 (describing failure to register as a strict-liability offense with no scienter element); *SEC v. Merchant Capital, LLC*, 311 Fed. App'x 250, 252–53 (11th Cir. 2009) (per curiam) (same); *SEC v. Collyard*, 154 F. Supp. 3d 781, 791 (D. Minn. 2015) (same), *vacated in part on other grounds by*, 861 F.3d 760 (8th Cir. 2017); *SEC v. Art Intellect, Inc.*, No. 2:11-CV-357, 2013 WL 840048, at *20 (D. Utah. Mar. 6, 2013) (same). Consequently, the SEC asserts, any reliance by the Defendants upon the advice of their counsel

regarding their need to register as "dealers" under the Exchange Act is immaterial to whether they violated the statute.[18]

The Court is inclined to agree that the SEC has a correct view of the law. The statute says nothing about specific intent: it speaks only in terms of whether the person has registered as a dealer or associated with a registered dealer. This means that a person's good-faith reliance upon the advice of counsel likely plays no role in whether a violation of registration requirement occurred. But the Court ultimately need not resolve this legal issue to decide the SEC's motion for summary judgment. Even if the advice-of-counsel defense is available in response to a claim under Section 15(a)(1) of the Exchange Act, there is no genuine dispute that the defense is unavailable to Defendants on this record.

At various points in their briefing, Defendants argue that Carebourn obtained advice from securities counsel and attorney opinions indicating that their transactions were lawful. [Dkt. 133 at 16; Dkt. 145 at 16; Dkt. 150 at 8.] In some instances, Defendants imply that because attorneys concluded that Carebourn could proceed with the transactions they signed off on, those lawyers "had to conclude that Carebourn was not acting as a 'dealer.'" [Dkt. 133 at 18–19.] And in Defendants' reply memorandum in support of their own motion for summary judgment, Defendants are more explicit, stating

---

[18] As the SEC has not briefed and the Court has not considered any question concerning remedies, the Court does not offer any opinion on whether reliance on the advice of counsel could be relevant to the propriety of any remedy sought by the SEC in this matter.

that "[t]he attorneys opine in writing that Defendants were not dealers." [Dkt. 150 at 8.] But even viewed in the light most favorable to Defendants, the record would not allow a reasonable jury to find in their favor on this issue.

Presumably, Defendants are relying on Mr. Turner's Code Green opinion letter to support their assertion that attorneys advised them they were not dealers and had no need to register.[19] But the letter cannot carry the weight Defendants place upon it. Mr. Turner testified that his statements in the Code Green letter were transaction specific. He also explained that no one at Carebourn ever sought his legal advice on the dealer-registration question. And Mr. Turner's deposition revealed that Defendants did not disclose all the information about Carebourn's business that would have been relevant to any legal advice about that issue. No one at Carebourn told Mr. Turner about how Carebourn promoted or advertised its business, nor about the volume of Carebourn's business of acquiring convertible notes, converting the debt into stock, and selling the stock into the market. [Turner Dep. 65:24–66:9.] Defendants did not tell him how they learned about or met with issuers, how quickly they typically sold the stock, or what their typical profits were. [Turner Dep. 66:23–67:8.] And Defendants did not inform Mr. Turner that Carebourn profited primarily from the difference between the discounted price it paid

---

[19] In their reply memorandum, Defendants did not cite any evidence to support the explicit statement that attorneys provided them such opinions. Defendants point to nothing in the record suggesting that Ms. Anthony or Ms. Culbertson made any statement akin to the Code Green letter regarding dealer registration. Both Ms. Anthony and Ms. Culbertson specifically disclaimed being asked to render advice on the dealer-registration issue. No reasonable jury could find that Defendants relied in good faith on advice they didn't ask for and weren't provided by Ms. Anthony or Ms. Culbertson.

issuers for the stock and the price at which they subsequently sold the stock into the market. [Turner Dep. 67:9–14.] These undisputed facts undermine any assertion of the advice-of-counsel defense because there was neither complete disclosure of relevant facts, nor a request for the advice in question that would have allowed any reliance that followed to be in good faith.

For all these reasons, the Court finds that the SEC is entitled to summary judgment in its favor on Defendants' First, Second, Third, Fourth, and Fifth Affirmative Defenses.[20]

### C. Count II – Relief Defendant Carebourn Partners

As discussed above, the SEC also seeks summary judgment on Count II of its Complaint, which is asserted against Carebourn Partners as a "Relief Defendant." The SEC contends that the undisputed facts show that Carebourn Partners "received ill-gotten gains from Defendants' unregistered dealer activity." [Dkt. 127 at 27 (heading).]

### Carebourn Partners' Fees

When Carebourn purchased convertible promissory notes from issuers, it charged the issuers certain fees that ultimately went to Carebourn Partners. [Rice Dep. 269:11–270:4, 271:10–14.] For example, a $239,200 convertible note purchased from Bravatek

---

[20] In a post-hearing letter, the SEC proposed that the Court enter an Order finding that it was entitled to summary judgment on Defendants' First through Ninth Affirmative Defenses. [Dkt. 157 at 1.] But as explained above, the defenses Six, Seven, Eight, and Nine relate to remedies and the SEC sought summary judgment on liability only. This conforms more closely to the relief sought in the motion the SEC actually filed. [Dkt. 127 at 32 (arguing only that the Sixth, Seventh, Eighth, and Ninth Affirmative Defenses address remedies and could not "defeat" the SEC's motion).]

Solutions, Inc. in 2017 included a provision requiring Bravatek to authorize payment of $8,000 as a "Transactional Expense Amount" to Carebourn or its designee to cover "accounting fees, due diligence fees, monitoring [costs], and/or other transactional costs incurred in connection with the purchase of the Note...." [Stockwell Aff., Ex. 8 at 1–2.] That $8,000 was disbursed directly to Carebourn Partners. [Dkt. 128-8 at 48.]  Carebourn similarly charged a $15,000 Transactional Expense Amount in connection with a 2018 note purchased from OZOP Surgical Corp. for transactional fees and other costs. [Stockwell Aff., Ex. 9 at 1–2.] That $15,000 was disbursed directly to Carebourn Partners as well. [Dkt. 128-9 at 49.] Similar transactional fees and direct payments to Carebourn Partners are found in connection with other notes. [Dkt. 130-4 at 3 ($3,000 fee in PetVivo note); Dkt. 128-26 at 2 ($75,787 payment to Carebourn Partners).] Based on the SEC's review of records from January 1, 2017 through September 24, 2021, "Carebourn Partners received $1,109,306.50 in 'transactional expense' fees charged to issuers who entered convertible notes with Carebourn Capital." [McShane Decl. ¶ 20 & Ex. E.]

### Discussion

"A relief defendant is not accused of wrongdoing, but a federal court may order equitable relief against such a person where that person (1) has received ill-gotten funds, and (2) does not have a legitimate claim to those funds." *SEC v. Quan*, No. CIV. 11-723 (ADM/JSM), 2014 WL 4670923, at *17 (D. Minn. Sept. 19, 2014) (quoting *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009)). Relief defendants are part of a lawsuit purely so a plaintiff has a means to collect. *Id.* at *18 (citing *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991)). A relief defendant's "legitimate claim in property that is the subject of

litigation will preclude" the plaintiff's request to obtain that property from the relief defendant. *Id.* (citing *SEC v. Founding Partners Capital Mgmt.*, 639 F. Supp. 2d 1291, 1294 (M.D. Fla. 2009)).

In support of its motion, the SEC argues that there is no genuine factual dispute that Carebourn Partners, which is controlled by Mr. Rice, received transactional fees as a result of Mr. Rice and Carebourn Capital's unregistered dealer activity. Therefore, the SEC contends, Carebourn Partners received ill-gotten funds and has no legitimate claim to the fees it received. [Dkt. 127 at 28.] In response to the SEC's motion, Defendants did not argue that Carebourn Partners could not be held liable as a relief defendant. Nor did Defendants point to any evidence indicating that there was a factual dispute that Carebourn Partners received the transactional fees charged to issuers. In fact, Defendants did not address this issue at all.[21] [Dkt. 145, *passim*.] As a result, Defendants have waived any argument that the SEC is not entitled to summary judgment, *Olson*, 2023 WL 4353820, at *31, and the SEC's motion is granted as to liability on Count II of its Complaint against Carebourn Partners.

## III.   Defendants' Motion

When viewed in the light most favorable to the SEC, a reasonable fact-finder could conclude from the record discussed in detail above that Carebourn and Mr. Rice

---

[21] In the briefing in support of Defendants' own motion for summary judgment they similarly did not specifically address the issue of Carebourn Partners' liability as a relief defendant. Generally, they argued that the Complaint failed to state a claim for disgorgement, but they did not even mention Carebourn Partners in this section of their brief. [Dkt. 133 at 44–46.]

were acting as unregistered dealers in violation of 15 U.S.C. § 78o(a)(1), and that

Carebourn Partners, LLC received fees charged to issuers as a result of that unregistered

dealer activity. Accordingly, with respect to issues of liability on Counts I and II of the

SEC's Complaint, Defendants' summary judgment motion is denied. Because the Court

has concluded above that the SEC is entitled to summary judgment in its favor on the

issue of liability, no trial is necessary.

    Only one area of the Defendants' own motion requires brief additional discussion.

Defendants seek summary judgment on the issue of the availability of disgorgement,

which is not addressed above in the Court's discussion of the SEC's cross-motion.

Specifically, Defendants argue that the Complaint fails to state a viable claim for

disgorgement because it fails to allege any causal link between the illegal activity and the

funds sought to be disgorged. Defendants contend that for the SEC to have appropriately

pursued a claim for disgorgement, they would need to allege that but for Defendants'

failure to register as dealers, Carebourn would not have obtained the same funds that the

SEC seeks to disgorge. [Dkt. 133 at 44–45.] Alternatively, Defendants argue that the

Exchange Act does not authorize disgorgement as a remedy in these circumstances

because "there are no victims" to whom the disgorged funds could be returned. [Dkt. 133

at 45.]

    If the Court were to address this issue now, no matter the outcome, this case would

still proceed to a remedies phase. Accordingly, the Court reserves any decision

concerning the availability of disgorgement until a later date. With respect to this issue,

Defendants' motion is therefore denied without prejudice, and they may renew their

arguments concerning the availability of disgorgement when the Court addresses

remedies.

## ORDER

Based on the discussion above, **IT IS HEREBY ORDERED THAT**

1. Plaintiff's Motion for Summary Judgment [Dkt. 125] is **GRANTED** as follows:

   a. Plaintiff is entitled to summary judgment as to the claim in Count 1 of its Complaint that Defendants Carebourn Capital, L.P. and Chip Rice were acting as unregistered dealers and not associated with an entity registered with the SEC as a dealer, and therefore violated Section 15(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C § 78o(a)(1).

   b. Plaintiff is entitled to summary judgment as to the claim in Count II of its Complaint that Relief Defendant Carebourn Partners, LLC received ill-gotten gains in the form of fees charged to issuers as a result of the unregistered dealer activity of Defendants Carebourn Capital, L.P. and Chip Rice in violation of Section 15(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a)(1), and that Carebourn Partners, LLC has no legitimate claim to the ill-gotten funds it received.

   c. Plaintiff is entitled to summary judgment on Defendants' First, Second, Third, Fourth, and Fifth Affirmative Defenses.

2. Defendant's Motion for Summary Judgment [Dkt. 132] is **DENIED** as set forth in Part III of this Memorandum Opinion and Order.

Date: September 27, 2023

  _s/Katherine Menendez_____
  Katherine Menendez
  United States District Judge