**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States Securities and Exchange Commission, | No. 21-cv-2114 (KMM/JFD) |
| Plaintiff, | |
| v. | **ORDER** |
| Carebourn Capital, L.P.; Carebourn Partners, LLC, *Relief Defendant*; and Chip Alvin Rice; | |
| Defendants. | |

The Securities and Exchange Commission brought this action alleging that Defendants Carebourn Capital, L.P. ("Carebourn Capital") and Chip Alvin Rice violated Section 15(a) of the Securities Exchange Act of 1934 by acting as unregistered securities dealers. Between 2017 and 2021, through the use of convertible promissory notes, Carebourn Capital and Mr. Rice bought and sold billions of newly issued shares of microcap securities, also known as penny stocks, resulting in several million dollars in revenue. The SEC also alleged that Carebourn Capital and Rice charged penny stock issuers transactional fees that were paid directly to Relief Defendant Carebourn Partners, LLC ("Carebourn Partners"). On September 27, 2023, the Court denied the Defendants' motion for summary judgment and granted summary judgment in favor of the SEC as to all three Defendants' liability.

This matter is now before the Court on the SEC's Motion for Remedies. ECF 186. The SEC seeks the following remedies against Carebourn Capital and Mr. Rice:

(1) permanent injunctions prohibiting them from further violating the federal securities laws as alleged in the SEC's complaint; (2) permanent penny-stock bars; (3) an order requiring them to pay, jointly and severally, disgorgement of net profits of $10,135,738.71, and prejudgment interest of $950,173.40, totaling $11,085,912.11; and (4) a civil penalty of $642,500 against each. Further, the SEC asks the Court to Order Relief Defendant Carebourn Partners to pay disgorgement of $1,109,306.50, and prejudgment interest of $103,924.66, totaling $1,213,231.16. Finally, the SEC seeks an order requiring Defendants to surrender for cancellation shares of stock from, and conversion rights under, convertible notes that issuers sold to them.

Defendants have agreed to surrender their remaining shares of stock and conversion rights. Based on that agreement, the Court will Order that relief below without further discussion. However, Defendants otherwise oppose the relief the SEC seeks. Defendants maintain that: the SEC has failed to make the required showing for entry of a permanent injunction or a penny-stock bar; the SEC has not demonstrated that disgorgement of any profits is appropriate, and even if it were, the amount of disgorgement requested is excessive; the Court should not impose any civil penalty, but even if it does, the amount should be far less than the SEC demands; and the SEC's calculation of prejudgment interest is excessive.

The Court held a hearing on the SEC's motion by videoconference on July 22, 2024. Having considered the entire record and the parties' arguments, the SEC's motion is granted in part and denied in part as explained in this Order.

I.      **Post-Hearing Letter Briefing**

An "interested party," Darkpulse, Inc. observed the hearing through its counsel. Before the SEC commenced this action, Carebourn Capital sued Darkpulse in Minnesota state court. Eventually, Darkpulse obtained a judgment in its favor in the state court action. Like this Court, the state court found that Carebourn engaged in unregistered dealer activity in violation of the federal securities laws. With permission of the Court, Darkpulse filed a letter concerning the remedies phase of this litigation. Darkpulse asserts that if the Defendants had registered as dealers, they would not have been able to engage in the lending activity that forms the basis of the SEC's claims in this case. Darkpulse also suggested that Mr. Rice made certain false statements in his declaration. ECF 218. The SEC and Defendants filed responsive letters, and Mr. Rice filed a corrected declaration clarifying an earlier error. ECF 221, 222, 223. The Court has reviewed these submissions and considered them to the extent they contain information the Court considers relevant to the remedies questions before it.

Of note, the Court is not persuaded by Darkpulse's suggestion in its letter that Mr. Rice made an intentionally false statement in his declaration provided in opposition to the motion for remedies when he stated that neither he nor Carebourn Capital had previously been found to have engaged in any violation of the dealer-registration requirement though the state court had previously reached the same conclusion that this Court did in its summary judgment order. This is an unreasonable reading of his declaration because, in a paragraph found later in the declaration, Mr. Rice specifically discusses the judgment the state court entered against Carebourn Capital. ECF 205 ¶ 18. If he had

3

engaged in a misrepresentation with the intent to mislead the Court it would have been a curious way to do so by identifying the very case in which another court had made an adverse finding against him. Beyond that, the Court finds that nothing in the parties' post-hearing letters is outcome determinative, and it would have reached the same conclusions set forth in this Order had they not been submitted.

Only one aspect of the parties' letters requires additional comment—namely, the second letter filed by Defendants. ECF 225. In their second letter, Defendants argue that Darkpulse's submission should be stricken from the record because its counsel violated the Local Rules of the District of Minnesota and engaged in unauthorized practice of law by filing the submission without having been admitted pro hac vice in this litigation. Defendants also asked the Court to issue sanctions against Darkpulse's counsel for requiring Defendants to engage in extra work responding to the letter brief. Next, Defendants argue that the state court's judgment in the Darkpulse litigation is based upon flawed rulings by Hennepin County District Judge Patrick Robben. Finally, Defendants contend that the averments in Darkpulse's letter require the Court to hold an evidentiary hearing concerning remedies and "stay the issue of liability."

Defendants' second letter reflects little more than the acrimony between it and Darkpulse and varyingly includes or hints at remarkably unreasonable requests for relief from this Court. In requesting that the Court sanction Darkpulse's counsel, Defendants ignore the fact that the undersigned expressly permitted them to file their letter brief. It would be difficult to imagine a decision more unreasonable than allowing an attorney to

take an action in a case and then sanctioning them for doing that very thing. These requests for sanctions are rejected.

The Court also rejects Defendants' suggestion that statements in Darkpulse's letter require an evidentiary hearing and some alteration of the Court's liability ruling. If it doesn't ask for it explicitly, Defendants' request for an evidentiary hearing comes perilously close to arguing an appeal of the state court judgment, which this Court, of course, would not entertain. In any event, nothing in Darkpulse's letter requires the Court to resolve disputed factual issues in this case through an evidentiary hearing. Nor will the Court "stay the issue of liability." The Court has already concluded the SEC is entitled to summary judgment on liability, so there is nothing to stay, and Defendants have neither received permission to file a motion for reconsideration, nor shown that the Court's summary judgment decision ought to be revisited.

## II.    Permanent Injunction and Penny Stock Bar

Because the law governing whether the Court should issue a permanent injunction and impose a penny-stock bar involves consideration of very similar, if not identical, factors, the Court discusses these issues together.

### A.  Legal Standards for Injunctive Relief and Industry Bar

#### 1.  Permanent Injunction

"The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Keener*, 644 F. Supp. 3d 1290, 1298-99 (S.D. Fla. 2022)

(quoting *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004)). Courts consider several

factors when assessing the likelihood the defendant will engage in future wrongdoing:

> (1) the egregiousness of the defendant's actions, (2) the
> isolated or recurrent nature of the infraction, (3) the degree of
> scienter involved, (4) the sincerity of the defendant's
> assurances against future violations, (5) the defendant's
> recognition of the wrongful nature of his conduct, and (6) the
> likelihood that the defendant's occupation will present
> opportunities for future violations.

*Id.* at 1299; *SEC v. Shanahan*, No. 07-cv-2879 (JNE/JJG), 2010 WL 173819, at *9 (D.

Minn. Jan. 13, 2010) (substantially same); *see also SEC v. Cap. Solutions Monthly Income

Fund, LP*, 28 F. Supp. 3d 887, 892 (D. Minn. 2014) (considering "(1) the degree of scienter

involved; (2) the isolated or repeated nature of the violations; (3) the defendant's

recognition of the wrongful nature of her conduct; and (4) whether, because of the

defendant's professional occupation, future violations could be anticipated").

### 2. Penny Stock Bar

"Under the Exchange Act, a court may prohibit any person who, at the time of the

alleged misconduct, was participating in any offering of penny stock from participating in

any future offering of penny stock." *Keener*, 644 F. Supp. 3d at 1302 (quoting *SEC v.

Almagarby*, 17-cv-62225, 2021 WL 4461831, at * 4 (S.D. Fla. Aug. 16, 2021)). "Before a

court may enter a penny stock bar, the SEC must demonstrate that the stock at issue in the

violations under review is, in fact, a penny stock." *Id.* (quoting *SEC v. Huff*, 758 F. Supp.

2d 1288, 1357 (S.D. Fla. 2010)).

In deciding whether to impose a penny stock bar, courts consider: "(1) the

egregiousness of the underlying securities law violation; (2) the defendant's repeat offender

status; (3) the defendant's role or position when he engaged in the [misconduct]; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *SEC v. Becker*, No. 09 CIV. 5707 (SAS), 2010 WL 2710613, at *1 (S.D.N.Y. July 8, 2010) (internal quotation marks omitted); *see also Shanahan*, 2010 WL 173819, at *16 (considering same factors in deciding whether to enter an officer/director bar based on a violation of section 10(b) of the Exchange Act); *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007) ("The standard for imposing such a bar essentially mirrors that for imposing an officer-or-director bar.").

## B. Discussion

Several factors support imposition of both an injunction and a penny-stock bar. First, the Court finds that the recurrent nature of the Defendants' misconduct weighs in favor of the requested injunctive relief and the bar on future penny-stock activity. Although Defendants argue that they engaged in a single violation of the dealer-registration requirement because they only failed to register once,[1] this characterization ignores the reality of their conduct. Each time the Defendants purchased convertible promissory notes, converted them into newly issued shares of stock at steep discounts from market prices, and then promptly sold as many converted shares into the market as they could, they engaged in unregistered-dealer activity. They did this hundreds of times during the relevant period, and it is a mischaracterization for Defendants to suggest that their conduct in this

---

[1] Defs.' Opp'n 19 ("While it is true that Defendants engaged in many debt conversions and stock sales over the course of several years, at bottom the Defendants committed a one-time violation by failing to register as a securities dealer when they first started the investment activities years ago.").

case involved a single violation of the securities laws. *See Keener*, 644 F. Supp. 3d at 1299 ("[T]he R&R accurately concludes that Keener's conduct was recurrent because he disregarded the dealer registration requirement during a period of over three years as he acted as an unlicensed dealer. . . . That conduct was not an isolated incident, but a systemic practice of noncompliance with the Exchange Act.").

Second, Mr. Rice's occupation as a longtime participant in the financial markets presents opportunities for future violations of the registration requirement. Mr. Rice has extensive experience acting as an unregistered dealer, and the Court finds that it is reasonably likely that he will engage in future violations if injunctive relief is not imposed.

Third, there is no question that Mr. Rice and Carebourn Capital have a significant economic stake in the violation of the securities laws at issue in this case. As the Court has already found, their unregistered-dealer activity generated millions of dollars in revenue over several years. And fourth, the Court finds that Mr. Rice was the central decision-maker who had the ultimate responsibility to decide which issuers Carebourn Capital would contract with to purchase convertible promissory notes. These factors provide additional support for imposition of injunctive relief and a penny-stock bar.

Other factors are neutral, weigh against imposition of injunctive relief or a penny-stock bar, or do not plainly point in one direction or the other. For example, the parties agree that Carebourn Capital and Mr. Rice did not act with scienter in violating the Exchange Act's dealer-registration requirement. This is consistent with the position taken by the SEC in summary-judgment briefing, with which the Court agreed, that a failure to register is a strict-liability offense that requires no showing of scienter. Nevertheless, the

absence of a showing that Defendants acted with scienter does not necessarily preclude imposition of an injunction or a penny-stock bar. *See SEC v. Almagarby*, 92 F.4th 1306, 1321 (11th Cir. 2024) (explaining that although "scienter is an important factor in this analysis, it is not a prerequisite to injunctive relief") (quotations omitted); *see also Keener*, 644 F. Supp. 3d at 1299–30 (imposing permanent injunction against future unregistered-dealer activity despite no showing of scienter). Although it is not dispositive, this factor weighs in favor of the Defendants.

The Court also finds that the SEC has failed to show that Mr. Rice's and Carebourn Capital's actions in failing to register were "egregious." The SEC suggests that the recurrent or "systematic" violation of the registration requirement supports this factor. Pls.' Mem. 7–8. While the Court has found that the recurrent nature of the violation here weighs in favor of injunctive relief and a penny-stock bar, these are listed as separate factors in the case law. Finding a defendant's conduct to be egregious merely because it is recurrent renders one of these factors superfluous. *Almagarby*, 92 F.4th at 1323 (rejecting the district court's acceptance of the SEC's position that defendant's conduct was egregious because it "spanned over three years and thousands of transactions" because that analysis "collapses the egregiousness determination into the recurrence factor"). The SEC has not presented evidence either to suggest that Defendants' violations of the dealer-registration requirement were "blatant" or that they involved fraud or scienter. *Id.* at 1324 (explaining that "several facts indicat[e] egregiousness: (1) 'blatant' securities-law violations, (2) knowingly or recklessly making material misrepresentations or omissions (fraud), and (3) scienter").

9

The Court also finds that consideration of the Defendants' attitude regarding their conduct does not clearly support a permanent injunction and permanent penny-stock bar. The SEC takes the position that Mr. Rice and Carebourn Capital are recalcitrant and that they continue to insist they did nothing wrong. However, Defendants have had every right to disagree with the SEC's allegations and put up a vigorous defense. Moreover, they still retain their appeal rights. *SEC v. Johnson*, 595 F. Supp. 2d 40, 45 (D.D.C. 2009) ("Needless to say, [defendant] has a right to vigorously contest the SEC's allegations and was not required to 'behave like Uriah Heep in order to avoid an injunction.'") (citing *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989)); *see also Shanahan*, 2010 WL 173819 at *15 (same). Like the *Keener* court, this Court gives little weight to this factor. *See Keener*, 644 F. Supp. 3d at 1300.

Next, the Court considers Mr. Rice's assurances against future violations. Mr. Rice offered a declaration, submitted under penalty of perjury, in which he states that he "acknowledge[s] and respect[]s the Court's summary judgment ruling in favor of the SEC." Rice Decl. ¶ 3, ECF 205. Further, he conveys his understanding of the Court's decision and declares that he "fully intend[s] to comply with and abide by the Court's ruling in this case." *Id.* And he testifies "I have no intention nor desire to engage in the same investment activities in the future and I certainly have no intention to do so again without registration as a dealer under the federal securities laws. The same is true for Carebourn Capital." *Id.* ¶ 8. Based on these statements, the Defendants contend that Mr. Rice has provided adequate assurances against future violations, and they argue that the SEC's enforcement of the dealer-registration requirement through lawsuits like this one has effectively

10

eliminated any market for Defendants to engage in similar future violations. The SEC argues that the Court should be unmoved by Mr. Rice's declaration. Specifically, the SEC points out that these statements are undermined because (1) Defendants purchased a convertible note and sold penny-stock after the SEC initiated this suit; (2) they were uncooperative in the underlying investigation; and (3) Mr. Rice "repeatedly lied during his deposition." Pls.' Reply 22, ECF 207; Pls.' Mem. 19.

Having considered the parties' competing arguments about the sincerity of Mr. Rice's assurances, the Court finds that this factor does not ultimately tip the balance in any particular direction. The Court is not particularly persuaded by the SEC's reliance on the fact that Defendants purchased a convertible note and sold penny-stock after the SEC initiated this lawsuit. To place significant emphasis on that fact would suggest that merely because they had been sued, Defendants were required to agree with the SEC, or at a minimum, to take the most cautious approach possible. While a more conservative approach may have been the prudent course of action here, the Court cannot say that this renders Mr. Rice's current assurances insincere. Nor does Defendants' lack of cooperation during the underlying investigation weigh heavily in this analysis, though the Court does note that it is an important consideration when determining whether to impose civil penalties. However, the Court is very troubled by Mr. Rice's deposition testimony in this case and the way in which it flatly contradicted earlier testimony he had given during the SEC's investigation. Summary Judgment Order 17–18, 27–28 (discussing inconsistencies between deposition testimony and prior testimony in effort to create issues of fact for trial). Although the Court does not fully adopt the SEC's characterization that Mr. Rice

11

"repeatedly lied under oath," this does not mean the Court ignores the importance of this issue. Mr. Rice demonstrated a willingness to, at best, significantly shape testimony provided under oath to suit his purposes depending on the stage of the proceedings. As a result, the Court does not have unreserved faith in the sincerity of the assurances he has provided now in his effort avoid the consequences of his unregistered dealer activity.

Ultimately, whether to impose a permanent injunction or even a more limited injunction, and whether to impose a penny-stock bar require a consideration of the totality of the circumstances and the foregoing factors inform whether the SEC has shown a reasonable likelihood that Defendants will engage in future violations absent injunctive relief. Carebourn Capital continues to operate as an investment business, and Mr. Rice, as its controlling officer, has had a lengthy career focused on the financial markets. Such a "firm position in the financial industry," combined with years of noncompliance with the Exchange Act's dealer-registration requirement support a finding that Defendants will engage in future violations if no injunctive relief is imposed. *Keener*, 644 F. Supp. 3d at 1301 (finding that the defendant's "decade-long history of noncompliance and nondisclosure, when combined with his firm position in the financial industry," supported imposition of a permanent injunction). The Court also finds support for this decision in the fact that during the investigation and this litigation, Mr. Rice provided contradictory testimony, which undermines the weight given to his assurances that he will not engage in future unregistered dealer activity.

The SEC asks the Court to enter the following permanent injunction against future

violations of the dealer-registration requirement:

> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Carebourn Capital, L.P. and Chip Rice ("Defendants") are permanently restrained and enjoined from violating, directly or indirectly, Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)], as a dealer [15 U.S.C. § 78c(a)(5)], by making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security pursuant to 17 C.F.R. § 240.15a-2 or commercial paper, bankers' acceptances, or commercial bills), unless the Defendants are registered with the Commission as a dealer, or associated with a registered dealer, in accordance with Exchange Act Section 15(b).

> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendants' general partners, limited partners, members, managing members, officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a).

ECF 192 at 1–2.

Defendants argue that if the Court concludes that injunctive relief is appropriate, it

should only "impose time-limited relief instead of life-time injunctive relief." Defs.' Opp'n

at 32. However, the cases Defendants cite in support of this request for, at most, time-

limited injunctive relief do not persuade the Court that the permanent injunction requested

here is inappropriate. Indeed, in two of the cited cases, even though courts limited the

duration of the industry bars to a term of years, they imposed permanent injunctions. *SEC*

*v. Findley*, No. 3:20-cv-0397 (SRU), 2024 WL 707264, at *11–12 (D. Conn. Feb. 21, 2024) (providing a time-limited industry bar prohibiting the defendant from serving as an officer or director of a publicly-traded company, but imposing a permanent injunction against future violations of fraud provisions in the Exchange Act and Securities Act); *SEC v. Gallison*, 2023 WL 3004882, at *2–3 (S.D.N.Y. Feb. 4, 2023) (imposing permanent injunction and a time-limited officer-and-director bar). Because the permanent injunction here does not limit future participation in the financial services industry, but only future illegality, this authority is less persuasive.

Defendants do not otherwise argue that the form of the permanent injunction requested by the SEC is improper. Accordingly, the SEC's motion is granted to the extent it seeks a permanent injunction against Defendants prohibiting future violations of the dealer-registration requirement.

The Court will also grant, in part, the SEC's request for imposition of a penny-stock bar, though it will not impose this industry bar permanently on Carebourn Capital and Mr. Rice. There is no dispute that Defendants' conduct in this case involved penny stocks, nor that the Court has the authority to bar Carebourn Capital and Mr. Rice from participating in the offering of any penny stock. *See* 15 U.S.C. § 78u(d)(6) ("In any proceeding . . . against any person participating in, or, at the time of the alleged misconduct who was participating in, and offering of penny stock, the court may prohibit that person from participating in an offering of penny stock. . . ."). Nevertheless, in determining whether to impose such a prohibition, the Court is mindful that the bar requested by the SEC would "prohibit[] unlawful *and* lawful penny-stock transactions," *Almagarby*, 92

14

F.4th at 1322, for the remainder of Mr. Rice's life and for as long as Carebourn Capital exists. The record in this case does not support a permanent injunction against future lawful penny-stock transactions, though Defendants' conduct does support a more limited penny-stock bar.

Defendants suggest that the Court should follow *Almagarby* and find that this record does not support any industry bar at all. Like *Almagarby*, 92 F.4th at 1323–26, where the Eleventh Circuit reversed the district court's imposition of a penny-stock bar, this case does not involve scienter or egregious conduct, and Defendants should not be punished for defending themselves in this litigation. However, unlike the defendant in *Almagarby*, as explained above, this case does provide "reason to question the sincerity" of Mr. Rice's "assurances against future securities-law violations." *Id.* at 1323. Indeed, the Court has explained above why it is not inclined to unreservedly accept Mr. Rice's assurances. And unlike Mr. Almgarby, Mr. Rice has not moved on to employment in an entirely different field. *Id.* at 1322 (indicating that Almagarby was employed in a home-repair business). In short, this case is different enough from *Almagarby* that the Eleventh Circuit's decision does not persuade the Court that no penny-stock bar would be appropriate here.

The SEC highlights that Mr. Rice engaged in at least one penny-stock transaction after the SEC filed suit, failed to comply with the SEC's administrative subpoenas until the SEC asked a federal court to hold Defendants in contempt, and provided testimony during his deposition in this case that directly conflicted with his prior testimony during the SEC's investigation. According to the SEC, these circumstances more closely align with the situation addressed by *Keener* court than that involved in *Almagarby*, and consequently,

15

the SEC argues that this Court should impose a permanent penny stock bar upon Defendants. Pl.'s Mem. 8; Pl.'s Reply 21–22. However, the *Keener* court did not impose a permanent penny-stock bar; rather, it limited the duration of the bar to a specific term of years. 644 F. Supp. 3d at 1303 (adopting the defendant's "proposal to temporarily limit the penny stock bar to five years"). The Court similarly finds that, in this case, the SEC has failed to show "a reasonable likelihood that [Carebourn Capital and Mr. Rice] cannot *ever* engage in lawful penny stock offerings." *Id.* The Court also notes that while Defendants engaged in unregistered-dealer transactions on a recurrent basis over many years, the conduct at issue in this case did not occur after Defendants had already been found to have violated the dealer-registration rules. *See SEC v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995) (indicating that a "before imposing a permanent bar," a court should consider whether there has been a "prior history of unfitness").

Accordingly, the Court will not permanently bar Defendants from engaging in any penny stock offering, trading, etc., as requested by the SEC. However, the Court will limit the scope of the penny-stock bar to a period of three years from the date of this Order.

## III.   Disgorgement

The SEC requests an Order requiring Carebourn Capital and Mr. Rice to pay, on a joint-and-several basis, disgorgement of net profits of $10,135,738.71. In addition, the SEC asks the Court to require Relief Defendant Carebourn Partners to pay disgorgement of $1,109,306.50, based on its receipt of ill-gotten gains from the conduct of Carebourn Capital and Rice.

**A. Legal Standards for Disgorgement**

Disgorgement is an equitable remedy that serves the purpose of depriving a wrongdoer of ill-gotten gains. *SEC v. Keener*, No. 20-cv-21254-BLOOM, 2022 WL 17748407, at *7 (S.D. Fla. Aug. 8, 2022), *R&R adopted in part, rejected in* part, 644 F. Supp. 3d 1290 (S.D. Fla. 2022).

There are two potential sources of a court's authority to issue an award of disgorgement under the Exchange Act. First, under 15 U.S.C. § 78u(d)(5), when the SEC brings an action under the securities laws, a court "may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." Although the statute does not define "equitable relief," in *Liu v. SEC*, 591 U.S. 71 (2020), the Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is [permissible] equitable relief. . . ." *Id.* at 74–75. The Supreme Court explained that disgorgement is a traditional equitable remedy focused on depriving wrongdoers of net profits attributable to their wrongdoing. *Id.* at 79–81. Therefore, courts are required to "deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Id.* at 91–92. In addition, the Court interpreted § 78u(d)(5)'s requirement that equitable relief be "appropriate or necessary for the benefit of investors" to mean that a disgorgement remedy "must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." *Id.* at 89.

After *Liu*, courts have generally held that the SEC can satisfy the so-called "victim-benefit requirement" by demonstrating that it plans to distribute disgorged funds to investors if it is able to collect. *Almagarby*, 92 F.4th at 1320 (finding that the SEC

adequately satisfied the victim-benefit requirement by explaining "that it planned to distribute awards to counterparties who had purchased shares from Almagarby and were negatively affected by the price impact of his selling activity); *SEC v. Arias*, No. 12-cv-2937 (RPK) (SIL), 2023 WL 1861641, at *4 (E.D.N.Y. Feb. 9, 2023) (finding it sufficient that "the SEC has stated that it will return disgorged funds to investors if it can collect them. . . . At this stage of the litigation, such a representation is enough."); *SEC v. Penn*, No. 14-CV-581 (VEC), 2021 WL 1226978, at *14 (S.D.N.Y. Mar. 31, 2021) (collecting cases); *SEC v. NIR Grp., LLC*, No. 11-CV-4723 (JMA) (AYS), 2022 WL 900660, at *4 (E.D.N.Y. Mar. 28, 2022). Other courts have required a more substantial showing. *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023) (finding an abuse of discretion where the district court determined that investors were victims without finding that they suffered pecuniary harm); *SEC v. Lemelson*, 596 F. Supp. 3d 227, 238 (D. Mass. 2022) ("[T]he SEC has not provided any evidence that it could identify victims and has left open whether it is feasible to create a Fair Fund.").

The second source is also found in Section 78u, and it is more direct. After the Supreme Court decided *Liu*, Congress amended section 78u. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4626. The statute now provides that "[i]n any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7). Notably, the 2021 amendment to the statute no longer requires that the equitable remedy of "disgorgement" be "for the benefit of investors." *See Keener*, 644 F. Supp. 3d at 1305; *SEC v. O'Brien*, 674

F. Supp. 3d 85, 103 (S.D.N.Y. 2023) ("[A]fter *Liu*, Congress enacted amendments to the relevant portion of the Exchange Act, suggesting that courts have greater discretion to order disgorged funds to be deposited with the Treasury.").

With respect to the amount of any disgorgement remedy, courts have found that the SEC need only provide a "reasonable approximation of the profits causally related to the fraud." *Lemelson*, 596 F. Supp. 3d at 238 (quotation omitted); *see also SEC v. Capital Solutions Monthly Income Fund, LP*, 28 F. Supp. 3d 887, 897 (D. Minn. 2014) ("As long as the measure of disgorgement is reasonable, the wrongdoer should bear the risk of any uncertainty."). And the SEC also must show that the profits are "causally connected to the violation" of the securities laws. *SEC v. Drake*, No. 2:20-cv-00405 MCS (PLAx),  2021 WL 12299079, at *2 (C.D. Cal. Oct. 7, 2021).

> The amount of disgorgement need only be a reasonable approximation of profits causally connected to the violation. . . . The SEC carries the burden of persuasion as to whether the disgorgement figure reasonably approximates the amount of unjust enrichment. . . . After the SEC meets this burden, a defendant must then demonstrate that the disgorgement figure was not a reasonable approximation. . . . Additionally, the ill-gotten gains include prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity.

*Id.* (internal citations and quotations omitted).

### B. Discussion

#### 1. Reasonable Approximation

As discussed below, the Court finds that the SEC has met its burden to show that during the relevant period of January 1, 2017 through September 24, 2021, a reasonable

approximation of Carebourn Capital's and Mr. Rice's net profits from their unregistered dealer business is $10,135,738.71. Further, the SEC has shown that during that same period, Relief Defendant Carebourn Partners received $1,109,306.50 in transactional fees charged by Defendants to issuers of the convertible notes as a result of Defendants' unregistered-dealer activity. And Defendants have failed to demonstrate that the SEC's calculation of disgorgement amounts is not a reasonable approximation of net profits.

The SEC establishes a reasonable approximation of Defendants' net profits through the declarations of Craig McShane. First McShane Decl., ECF 129; Second McShane Decl., ECF 190. For the period of January 1, 2017 through September 24, 2021, McShane reviewed general ledgers and "master files" containing securities purchase agreements, conversion notices, convertible notes, and disbursement authorizations, as well as documents from brokers, transfer agents, issuers of notes and stocks, traditional banks, accountants, and other service providers hired by Defendants. First McShane Decl. ¶¶ 3–4. Over that time, Carebourn Capital purchased 93 convertible notes from 27 different issuers, purchased 18 convertible notes from third parties, and converted shares of 37 convertible notes across 23 different issuers. It spent $17,499,051.84 to purchase the notes in the form of cash to issuers, purchases from third parties, and fees paid to service providers such as attorneys and auditors. *Id.* ¶ 15. Over that same time, Carebourn Capital's gross revenue from stock sales across 32 issuers was $26,170,463.29; $4,940,834.83 in repayments of principal on convertible notes from 23 issuers; $527,343.70 from the sale of 12 convertible notes from six issuers to third parties, and $22,500 from fees charged to two issuers. *Id.* ¶¶ 16–17. This resulted in total cash receipts of $31,661,141.82, and subtracting

the $17,711,181.85 in expenditures Carebourn Capital laid out to acquire the convertible

notes, McShane determined that Carebourn Capital's net income was $13,949,959.97. *Id.*

¶¶ 18–19.

McShane further reviewed financial statements from Carebourn Capital for the

years 2017–2021 in an effort to identify additional business expenses to be deducted from

Carebourn Capital's net income. Second McShane Decl. ¶ 7. He did not include certain

expenses among those deductions, such as $98,501.88 in rent that Carebourn Capital paid

to Linrick Industries; $1,820,788.79 in commission payments that Carebourn Capital paid

to Linrick; $17,633,098.58 in "bad debt" expenses identified in the financial statements as

principal note balances deemed no longer collectible; expenses for advertising ($25,208),

travel ($6,806), meals and entertainment ($1,277); and fees ("200,068), office ($12),

management ($2,000), and reimbursements ($2,433) for which McShane could not confirm

the specific business purpose.[2] *Id.* ¶ 8. Setting aside those expenses, McShane identified

$3,814,221.26 in business expenses to be excluded, and he determined that a reasonable

approximation of $10,135,738.71. *Id.* ¶¶ 7, 9.[3]

---

[2] Defendants' own calculations include write-offs for the so-called "bad debt" expenses that the SEC did not deduct. The Court addresses this issue in more detail below. Defendants also take issue, generally, with the methodology the SEC used to reach its approximation of Defendants' profits, and the Court discusses this issue below as well. However, Defendants do not specifically argue that the SEC should have allowed deductions for rent, marketing, advertising, and other categories that Mr. McShane decided not to deduct.

[3] The disgorgement amount does not include Defendants' investments in two ventures— Sustainable Metal Solutions and Acres Gaming—that Defendants argue should be excluded from any monetary judgment the Court finds appropriate. Pl.'s Reply 9 n.2; Def.'s Opp'n 25; ECF 205 ¶ 19.

Further, McShane explained that during the review period, documentation showed that Carebourn Partners received $1,109,306.50 in "transactional expense" fees charged to penny stock issuers that entered the convertible note agreements with Carebourn Capital. *Id.* The transactional expense fees were included in the principal amount of the notes that the issuer was required to repay and were paid directly to Carebourn Partners from Carebourn Capital. First McShane Decl. ¶ 20 & Ex. E.

Defendants challenge the sufficiency of the SEC's showing in three ways: (1) the SEC has failed to meet its burden because Mr. McShane's calculations are based on an insufficient review of relevant documents that should have included Defendants' financial statements and tax returns; (2) Mr. McShane's approximation should have written off millions in so-called "bad debt" expenses rather than including them in the Defendants' income; and (3) if the Court grants the SEC's request for disgorgement, Defendants suggest a reasonable approximation of net profits should be no more than $1,176,087. The Court finds these arguments unpersuasive.

First, Defendants argue that it is unclear what documents McShane reviewed and that his calculations are unreliable because he should have based them on Carebourn Capital's financial statements and tax returns. But McShane plainly stated the types of documentation that he relied upon in conducting his assessment of Defendants' net revenue obtained from the relevant transactions, and he used financial statements to identify proper business expenses. First McShane Decl. ¶ 3; Second McShane Decl. ¶¶ 3, 7. Defendants have not persuaded the Court that McShane's calculations fail to provide a reasonable

approximation of profits because of any lack of clarity regarding the documents he reviewed.

Second, Defendants' base their own calculations in large part on writing off certain "bad debt" expenses that the Court finds should not be excluded from a reasonable approximation. Defendants removed the costs of loans that they deemed worthless from Carebourn Capital's balance sheet as a bad debt expense. Third McShane Decl. ¶ 5, ECF 208.[4] Between January 1, 2017 and September 24, 2021, Carebourn Capital's balance sheets reflect $18,211,414.00 in such bad debt expenses. *Id.* ¶ 6. However, in the SEC's assessment, Mr. McShane already accounted for bad debt expenses during the relevant period as "cash to issuers," so these amounts have already been factored into the approximation of net profits. First McShane Decl. ¶ 8(c). In addition, McShane explains that a total of 30 percent of these expenses—totaling $5,508,968.27—were based on convertible notes and other assets purchased by Carebourn Capital prior to January 1, 2017, but written off as expenses in subsequent years. Third McShane Decl. ¶ 7. However, Defendants' own calculations do not include any income generated from the notes purchased prior to the relevant period, whether in the form of principal payments or through stock conversions. Including the losses for these transactions, but not the gains undervalues the profits actually obtained in the relevant period. Further, some of the bad debt expenses

---

[4] This document is captioned as the "Second Declaration of Craig L. McShane in support of SEC's Motion for Remedies." Because the SEC relies on two declarations from McShane that were filed directly in connection with the remedies motion as well as his declaration submitted in support of the SEC's motion for summary judgment, the Court refers to them in as the First, Second, and Third declarations in the order they were filed.

reflected in Defendants' calculations include transactional fees that were paid to Carebourn Partners as opposed to any issuers. *See* Third McShane Decl. ¶ 10. The Court finds that deducting such bad debt expenses from the calculation of Defendants' profits would not be appropriate.[5]

### 2. Defendants' Remaining Arguments

The Court also finds unpersuasive Defendants' remaining arguments that the SEC failed to show that disgorgement was for the benefit of investors, that the SEC has proved no causal connection between the statutory violation at issue in this case and any profits Defendants obtained, and that the SEC has not met its burden with regard to Relief Defendant Carebourn Partners.

### *For the Benefit of Investors*

First, Defendants contend that under *Liu*, to show that a disgorgement award is for the benefit of investors, the SEC is required to demonstrate specific instances where investors suffered pecuniary harm as a result of Defendants' conversions of the notes and subsequent stock sales. Although this presents an interesting question that the Eighth Circuit has not squarely addressed, the Court does not adopt Defendants' position. The Court agrees with the Eleventh Circuit's analysis in *Almagarby*. 94 F.4th at 1320. As

---

[5] The court is also not persuaded that the substantial losses identified in Carebourn Capital's financial statements and tax returns for 2019 and 2020 show that the SEC's reasonable approximation of Defendants' profits is improperly inflated. As the Court previously observed, Mr. Rice testified that Carebourn Capital was consistently profitable and never failed to pay dividends to its investors. Summ. J. Order 29–30, ECF 177. In *Sec. & Exch. Comm'n v. Sripetch*, No. 20-cv-01864-H-BGS, 2024 WL 1546917, at *6 (S.D. Cal. Apr. 8, 2024), the court did not have before it any comparable evidence undermining the persuasiveness of the defendant's tax returns. But here, this Court is not persuaded by Defendants' argument that it should similarly accept their calculations of profits.

explained in *Almagarby*, the principal holding in *Liu* is that an award of "disgorgement must not exceed a wrongdoer's net profits and must be awarded for victims to be permissible under section 78u(d)(5)." *Id.* (internal quotations omitted). However, the SEC is not required to "link loss amounts to specific instances of investor harm to satisfy the requirements of section 78u(d)(5)." *Id.* (citing *SEC v. GenAudio Inc.*, 32 F.4th 902, 952–53 (10th Cir. 2022)). Instead, the SEC need only "identify investors who have suffered pecuniary harm" to show that a disgorgement award is "for the benefit of investors" under § 78u(d)(5) and demonstrate that it intends to distribute the award to investors. *Id.*; *accord SEC v. Keener*, 102 F.4th 1328, 1337 (11th Cir. 2024) (following *Almagarby* and finding that *Liu*'s victim-benefit requirement was satisfied where the SEC provided evidence that investors had stock price declines and the agency "promised to distribute the disgorged profits to investor-victims who suffered from [the defendant's] activity"); *but see SEC v. Govill*, 86 F.4th 89, 105 (2d Cir. 2023) (finding that the district court abused its discretion by awarding disgorgement without showing that particular investors suffered "pecuniary harm").

In addition, the Court notes that the post-*Liu* amendment to the statute, adding § 78u(d)(7), explicitly provides that disgorgement may be awarded, but it does not include the "for the benefits of investors" language found in § 78u(d)(5). Under this provision, the Court has even greater flexibility, and may prevent unjust enrichment by disbursing collected funds that cannot be returned to investors to the Treasury. *Keener*, 644 F. Supp. 3d at 1305; *SEC v. Spartan Secs. Gr., Ltd.*, 620 F. Supp. 3d 1207, 1225 (M.D. Fla. 2022)

("Between the money staying with [the defendant] or a fund at the Treasury, it is more equitable to order disgorgement.").

The SEC has made the required showing here. An SEC financial economist identified the dates of Carebourn Capital's sales of stocks from penny-stock issuers through various broker-dealers. Gullapalli Decl. ¶ 6, ECF 191. He obtained data for the issuers' market prices from a subscription-based database that provides comprehensive financial market data and compared it to the Defendants' trading records to identify the price movement that coincided with Defendants' trades. *Id.* ¶ 7. Based on that comparison, he found that the share prices of issuers whose stock was sold by Carebourn Capital experienced large declines over the trading periods, and 28 out of 29 issuers' share prices dropped during the period in which Defendants made their trades. *Id.* ¶ 8; *id.*, Exs. 1–5. Moreover, the SEC avers that it intends to establish a fair fund for distribution of disgorged funds to Carebourn Capital's investors and issuers, and "[a]ssuming there are adequate funds to distribute to harmed victims, the SEC will file a proposed distribution plan with the Court. Defendants and Relief Defendant then may raise any objections they have. The SEC will only proceed with the distribution plan once it has this Court's approval." SEC Mem. 14. The SEC further states that any funds it is unable to disburse to harmed investors or issuers can be disbursed to the Treasury to prevent Defendants' unjust enrichment.

### *Causation*

Next, Defendants argue that the SEC has failed to show that any of their profits from converting the promissory notes into shares of stock and reselling them to the market are causally linked to their violation of the dealer-registration requirement. They contend that

the SEC has failed to demonstrate that, but for their failure to register, they would not have been able to engage in the same transactions and obtained the same revenues.

The Court disagrees with Defendants' framing of causality here. In other cases like this one, other courts have found a causal connection to engaging in unlawful, unregistered dealer activity without requiring a separate showing that, had the Defendants registered, the transaction would not have occurred. The Eleventh Circuit rejected an identical argument to that raised by Defendants in *Almagarby*:

> Finally, Almagarby's profits were causally linked to his failure to register. Section 15(a) prohibits unregistered dealers from using interstate commerce "to effect *any transactions* in . . . any security." *Id.* § 78o(a)(1) (emphasis added). Almagarby was altogether prohibited from making transactions as an unregistered dealer, so *any* profits generated from his prohibited transactions were causally linked to his failure to register. *See SEC v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014) (providing that the Commission's civil enforcement actions need not show "proximate causation"); *see also SEC v. Apuzzo*, 689 F.3d 204, 212–13 (2d Cir. 2012).

> The district court did not have to speculate about the profits of any lawful transactions that Almagarby *might* have made had he chosen to register as a dealer. . . . Indeed, had Almagarby registered, he likely would have faced significant restraints on his toxic lending activity. For example, dealers must comply with self-regulatory organizations' rules, and the Commission asserts that Almagarby likely would have been limited by regulations such as the industry prohibition on "unfair or unreasonable" underwriting activity. *See* FINRA Rule 5110(c)(2)(A). So the district court did not abuse its discretion by ordering Almagarby to disgorge the profits causally linked to his failure to register.

92 F.4th at 1320–21. Other courts have rejected Defendants' argument for similar reasons. *See Keener*, 102 F.4th at 1337 (same, following *Almagarby*); *SEC v. Fierro*, No. 20-02104 (GC) (JBD), 2024 WL 2292054, at *6 (D.N.J. May 21, 2024) (same).

The Court agrees with the analysis of the causation issue in these cases and rejects Defendants' argument to the contrary. Moreover, the Court notes that in its post-hearing letter, the SEC explains in detail the type of "oversight, standards, and heightened scrutiny that comes with dealer registration." ECF 221 at 4. These include statutory and regulatory provisions requiring registered dealers to provide regular reports with information about their assets, cash flow, and internal compliance measures. *Id.* at 3 (citing 15 U.S.C. § 78q(e)(1)(A); 17 C.F.R. §§ 240.15c3-1, 240.15c3-3(e), 240.17a-5(a), (d)(1), (2), (3)). And the SEC represents that because of the heightened oversight for penny stock trading, the agency suspended trading for several of the issuers from whom Defendants purchased promissory notes during the four-year period relevant to this case. *Id.* at 3–4. This information supports the SEC's contention that if Carebourn Capital and Mr. Rice had registered, increased oversight would likely have presented obstacles to Defendants' lending and conversion activities.

### *Relief Defendant Carebourn Partners*

Defendants argue that the SEC's request for disgorgement of $1,109,306 from Relief Defendant Carebourn Partners should be denied because the "transactional expenses" that this figure represents were not derived from Carebourn Capital's unregistered dealer activity. Rather, Defendants argue, the transactional expense fees were derived from Carebourn Capital's activity of providing cash loans to issuers, and the fees

paid to Relief Defendant came out of Carebourn Capital's cash accounts. Accordingly, Defendants contend that there is no causal connection between the expense fees and any unregistered-dealer activity.

The Court rejects Carebourn Partners' efforts to characterize the transactional expense fees that it obtained directly from Carebourn Capital as a result of the convertible note transactions as unrelated to Defendants' unregistered-dealer activity. Carebourn Capital was prohibited from engaging in these transactions because they did so without registering as a dealer, and the fees that were passed through to Carebourn Partners were the direct result of those transactions. Therefore, the Court finds that the fees paid to Carebourn Partners were causally related to the unregistered dealer activity at issue in this case. Carebourn Partners raises no other argument to suggest that an award of disgorgement as to it would be improper, and the Court concludes that it is not.

### 3. Prejudgment Interest

The SEC also seeks to recover prejudgment interest on the disgorgement sums that the Court ultimately awards. Defendants argue that if the Court decides to award disgorgement, it should exercise its discretion to deny the SEC's claim for prejudgment interest because neither Carebourn Capital nor Mr. Rice has the financial means to pay prejudgment interest on top of a disgorgement award.

"Courts ordering disgorgement may also order prejudgment interest on the disgorged amount." *SEC v. Quan*, No. 11-cv-723 (ADM/JSM), 2014 WL 4670923, at *14 (D. Minn. Sept. 19, 2014), *amended*, No. 11-cv-723 ADM/JSM, 2014 WL 6982914 (D. Minn. Dec. 10, 2014), *aff'd*, 817 F.3d 583 (8th Cir. 2016). The purpose of awarding

prejudgment interest is to prevent a defendant from profiting from a violation of the securities laws and depriving "a defendant from obtaining the benefit of an interest-free loan due to his unlawful conduct." *Id.* "The rate of interest commonly used by courts when ordering prejudgment interest in connection with disgorgement is the rate applied by the Internal Revenue Service ("IRS") for the underpayment of federal income tax." *Id.*

District courts have discretion when determining whether to award prejudgment interest. *SEC v. Markusen*, 143 F. Supp. 3d 877, 894 (D. Minn. 2015). In exercising that discretion, courts consider the following criteria:

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance.

*Id.* (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)).

In arguing that the Court should decline to award prejudgment interest, Defendants focus on the fairness and relative equities of such an award by reference to the financial conditions of Mr. Rice and Carebourn Capital to the exclusion of the other relevant factors. Even if Defendants have financial challenges to payment of an award, they ignore the special importance of the remedial purpose of the statutory provisions that allow the SEC to recover disgorgement. Defendants have had the benefit of receiving millions of dollars of profits as a result of their unregistered dealer activity, and disgorging those amounts without a payment of prejudgment interest will allow them to retain the benefit of keeping

those revenues for several years without any recognition of the time value of those funds. This would essentially allow Defendants to have obtained the very no-interest loan that an award of prejudgment interest is designed to prevent. Awarding prejudgment interest here in the amounts requested by the SEC will serve the purpose of preventing Defendants from being unjustly enriched as a result of their unregistered-dealer activity and will allow the SEC, through the establishment of a fair fund, to distribute funds to investors and issuers in an amount that provides full compensation for their losses.

Defendants do not contest Mr. McShane's calculation of an appropriate amount of prejudgment interest on the disgorgement amounts the Court has found appropriate above. For Defendants Carebourn Capital and Mr. Rice, McShane calculates those amounts as $950,173.40, and for Relief Defendant Carebourn Partners, he concludes that $103,924.66 is owed. Second McShane Decl. ¶¶ 10, 12.

### 4. Conclusion

In sum, the Court concludes that the SEC has met its burden to provide a reasonable approximation of the Defendants' net profits, and the SEC's calculation of legitimate business expenses is more persuasive than Defendants' alternative calculations. Accordingly, the Court finds that Defendants Carebourn Capital and Chip Rice are jointly and severally liable for disgorgement in the amount of $10,135,738.71, and prejudgment interest in the amount of $950,173.40. Relief Defendant Carebourn Partners is liable for disgorgement in the amount of $1,109,306.50, and prejudgment interest in the amount of $103,924.66.

## IV.   Civil Penalties

The SEC requests civil penalties against Carebourn Capital and Chip Rice in the amount of $642,500 each, which amounts to 12.7 percent of the SEC's proposed disgorgement figure.

### A. Legal Standards for Civil Penalties

The Exchange Act authorizes courts to impose civil penalties for violations of federal securities laws according to a three-tier system of increasing amounts. 15 U.S.C. § 78u(d)(3)(A)-(B). Only the first-tier penalty is at issue.[6] The Exchange Act sets forth the following regarding the first-tier civil penalty:

> The amount of a civil penalty imposed under subparagraph (A)(i) shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.

*Id.* § 78u(d)(3)(B)(i); *see also Keener*, 644 F. Supp. 3d at 1308 ("Regardless of the tier, the Court may impose a penalty up to the amount of a defendant's gross pecuniary gain."). The amounts of the first-tier civil penalties, adjusted for inflation, are now $11,524 for a natural person and $115,231 for an entity. *See* U.S. Securities and Exchange Commission, Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange

---

[6] Courts can order the second and third tiers of civil penalties only where the violation at issue "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii)–(iii). The SEC does not argue any of these circumstances are at issue here.

32

Commission (Jan. 15, 2024), https://www.sec.gov/enforce/civil-penalties-inflationadjustments.

Civil penalties serve both a punitive and deterrent purpose. *Keener*, 644 F. Supp. 3d at 1308; *see also SEC v. Jarkesy*, 144 S. Ct. 2117, 2130 (2024) ("In sum, the civil penalties in this case are designed to punish and deter, not to compensate."). Courts have discretion to determine "whether to impose a civil penalty and in what amount." *Keener*, 644 F. Supp. 3d at 1308; *Quan*, 2014 WL 4670923, at *16 (D. Minn. Sept. 19, 2014).

Courts consider several factors that are similar to those taken into account when considering whether to impose an injunction or an industry bar. *E.g.*, *SEC v. Spartan Sec. Gr., Ltd.*, 620 F. Supp. 3d 1207, 1229 (M.D. Fla. 2022). Among the relevant factors are: (1) egregiousness; (2) scienter; (3) repeated violations; (4) admissions of wrongdoing; (5) losses resulting from defendant's violations; (6) defendant's cooperation with enforcement authorities; and (7) defendant's financial condition. *Id.*; *see also Markusen*, 143 F. Supp. 3d at 894–95 (same).

**B. Discussion**

Although similar factors relevant to imposition of civil penalties lead the Court to impose a permanent injunction and a three-year industry bar, the Court finds that no civil penalty should be imposed under the circumstances of this case for several reasons. First, the SEC made no showing that Defendants acted with scienter and have not demonstrated that their unregistered-dealer activity was particularly egregious. Nor does the record indicate that before the Defendants engaged in their convertible-note business in this case

they had previously been found to have violated the dealer-registration requirement or any other regulations.

Also, the Defendants' financial condition weighs against such penalties, particularly in light of the substantial disgorgement order. The parties disagree over the effect Defendants' financial condition should have on the propriety of civil penalties. Defendants argue that they do not have the financial means to pay the civil penalties sought by the SEC. Mr. Rice states that his only income at the moment is a monthly Social Security check and he does not have significant assets that can be liquidated to pay a civil penalty. He explains that his car and home are owned by his wife, that he has modest balances in his checking and savings account that are held jointly with his wife, and that has a half interest in approximately $15,000 of household furniture and goods. Mr. Rice avers that his current net worth is negative $3,309. Rice Decl. ¶¶ 14–15. Further, Mr. Rice indicates that Carebourn Capital does not have the assets to pay a large civil penalty. He states that Carebourn Capital holds $475,095 in assets at several brokerage firms that are untradeable securities and $3,126,510 in investments in two private companies. Rice Decl. ¶ 17. Finally, Mr. Rice testifies that Carebourn Capital is subject to a nearly $400,000 judgment against it in the Minnesota state court action in favor of Darkpulse. *Id.*

The SEC argues that Defendants have failed to meet their burden to show that they are unable to pay a civil penalty, and even if they are, that alone does not mean that a civil penalty cannot be awarded. The SEC criticizes Mr. Rice's declaration concerning his financial condition as a "self-prepared" and "self-serving," lacking any explanation for how Mr. Rice made his calculations.

Under the circumstances of this case, the Court gives some weight to Defendants' financial condition. If the SEC is correct that Mr. Rice and Carebourn Capital have at least $3 million in assets that could potentially be collected by the agency, that will go toward the disgorgement award of over $10 million, along with prejudgment interest. The Court is mindful that disgorgement and civil penalties serve different purposes, which have led some courts to determine that a civil penalty is warranted even when they order disgorgement of profits. *Sec. & Exch. Comm'n v. Bajic*, No. 20 CIV. 7 (LGS), 2023 WL 6289953, at *5 (S.D.N.Y. Sept. 27, 2023) ("Congress provided for civil penalties because disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud.") (internal quotations omitted). But the SEC has not demonstrated that a civil penalty is necessary to punish the Defendants for violating the dealer-registration requirement or to deter future violations. Moreover, the SEC has indicated that its plan is to establish a "fair fund" from which to distribute disgorged funds to investors who were harmed by Defendants' unregistered dealer activity. Declining to impose a civil penalty will help ensure that any funds Defendants do have are available for distribution to such investors.

For these reasons, the SEC's request for imposition of civil penalties is denied.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1.     Plaintiff's Motion for Remedies is GRANTED IN PART and DENIED IN PART as set forth herein.

2. The motion is denied to the extent that it seeks civil penalties against Carebourn Capital, L.P. and Chip Rice.

3. Carebourn Capital, L.P. and Chip Rice ("Defendants") are permanently restrained and enjoined from violating, directly or indirectly, Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)], as a dealer [15 U.S.C. § 78c(a)(5)], by making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security pursuant to 17 C.F.R. § 240.15a-2 or commercial paper, bankers' acceptances, or commercial bills), unless the Defendants are registered with the Commission as a dealer, or associated with a registered dealer, in accordance with Exchange Act Section 15(b);

4. Pursuant to Federal Rule of Civil Procedure 65(d)(2), the permanent injunction set forth in Paragraph 2 of this Order also binds the following who receive actual notice of the Final Judgment by personal service or otherwise: (a) Defendants' general partners, limited partners, members, managing members, officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a).

5. Defendants are barred, for a period of three years from the date of this Order, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

36

6.      (a) Defendants are jointly and severally liable for disgorgement of $10,135,738.71, representing net profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $950,173.40, for a total of $11,085,912.11; and (b) Relief Defendant Carebourn Partners, LLC ("Relief Defendant") is liable for disgorgement of $1,109,306.50, representing the receipt of ill-gotten gains from Defendants' illegal conduct, together with prejudgment interest thereon in the amount of $103,924.66, for a total of $1,213,231.16.

7.      Within ten days of entry of Judgment, Defendants must surrender for cancellation their remaining shares of stock of the issuers listed in Exhibit 1 of the SEC's motion for remedies in this case and surrender their remaining conversion rights under the convertible securities issued by the Issuers. Further, Defendants shall send copies of correspondence evidencing the surrender for cancellation of Defendants' remaining shares of the Issuers and their remaining conversion rights under the convertible securities issued by the Issuers to the SEC addressed to Charles J. Kerstetter, U.S. Securities and Exchange Commission, 175 W. Jackson Blvd., Suite 1400, Chicago, IL 60604.

**Let Judgment be entered accordingly.**


 Date: September 20, 2024                    *s/Katherine Menendez*
                                             Katherine Menendez
                                             United States District Judge